aRom Bar-Nissim (SBN 293356)
Rom@HeahBarNissim.com
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 432-2836

Jarrett Lee Ellzey (*Pro Hac Vice*)
Tom Kherkher (*Pro Hac Vice*)
Leigh S. Montgomery (*Pro Hac Vice*)
ELLZEY KHERKHER SANFORD MONTGOMERY LLP
4200 Montrose Street, Suite 200
Houston, TX 77006
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com

*Attorneys for Plaintiffs and the Proposed Class*
*[Additional Names in Signature Block]*

Rohit D. Nath (SBN 316062)
Michael Gervais (SBN 330731)
SUSMAN GODFREY L.L.P
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com
MGervais@susmangodfrey.com
SFrazier@susmangodfrey.com

Max L. Tribble, Jr. (SBN 326851)
Justin A. Nelson *(Pro Hac Vice forthcoming)*
SUSMAN GODFREY L.L.P
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
MTribble@susmangodfrey.com
JNelson@susmangodfrey.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

TED ENTERTAINMENT, INC., MATT FISHER, GOLFHOLICS, INC., each individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

BYTEDANCE INC.,

Defendant.

Case No. 3:25-CV-10933-JSC

Honorable Jacqueline Scott Corley

**PLAINTIFFS' OPPOSITION TO BYTEDANCE INC.'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Date: September 24, 2026
Time: 10:00 AM
Place: Courtroom 8, 19th Floor

**DEMAND FOR JURY TRIAL**

Complaint Filed: April 13, 2026

## TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **4**

I. The Digital Millennium Copyright Act and Section 1201(a) .......... 4

II. YouTube and Access Restrictions .......... 5

III. ByteDance's Circumvention of YouTube's Access Restrictions .......... 5

**LEGAL STANDARD** .......... **6**

**ARGUMENT** .......... **6**

I. Plaintiffs Have Alleged Concrete Injuries Sufficient for Article III Standing .......... 6

II. The Plain Text of the DMCA Squarely Forecloses ByteDance's Statutory Standing Argument .......... 10

III. Plaintiffs Have Alleged Circumvention of Access Controls Under Section 1201(a) .......... 11

a. Plaintiffs Have Alleged TPMs that Effectively Control Access to Their Works .......... 11

b. YouTube's TPMs Are Access Controls Even If They Do Not Prevent Users from Viewing the Works on YouTube's Platform .......... 17

c. YouTube's TPMs Can Be Both Access and Copy Controls .......... 19

d. ByteDance Cannot Overcome the Unbroken Line of Post-*VidAngel* Decisions Denying Motions to Dismiss on YouTube's TPMs .......... 23

IV. Plaintiffs Have Sufficiently Alleged the Timing and Nature of YouTube's Technological Protections and ByteDance's Large-Scale Scraping Operation .......... 24

**CONCLUSION** .......... **25**

## TABLE OF AUTHORITIES

***CASES***

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .... 6

*Ass'n for Info. Media & Equip. v. Regents of the Univ. of Calif.*,
No. 2:10-cv-09378, 2012 WL 7683452 (C.D. Cal. Nov. 20, 2012) .... 22

*Avaya, Inc. v. Telecom Labs, Inc.*,
No. 06-2490, 2012 WL 13035096 (D.N.J. May 1, 2012) .... 19

*Callahan v. Ancestry.com, Inc.*,
No. 20-cv-08437, 2021 WL 2433893 (N.D. Cal. June 15, 2021) .... 9

*CDK Global, LLC v. Tekion Corp.*,
No. 25-cv-01394, 2025 WL 1939951 (N.D. Cal. July 15, 2025) .... 1, 17

*Cordova v. Huneault*,
817 F. Supp. 3d 819 (N.D. Cal. 2026) .... 3, 10, 24

*CouponCabin LLC v. Savings.com, Inc.*,
No. 2:14-cv-39, 2016 WL 3181826 (N.D. Ind. June 8, 2016) .... 16, 17

*Craigslist, Inc. v. Naturemarket, Inc.*,
694 F. Supp. 2d 1039 (N.D. Cal. 2010) .... 16

*Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*,
965 F.3d 365 (5th Cir. 2020) .... 19

*Disney Enterprises v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) .... *passim*

*Doe 1 v. GitHub, Inc.*,
672 F. Supp. 3d 837 (N.D. Cal. 2023) .... 9

*Echostar Satellite L.L.C. v. Viewtech, Inc.*,
543 F. Supp. 2d 1201 (S.D. Cal. 2008) .... 10, 11

*Edland v. Basin Elec. Power Coop.*,
No. 21-cv-04008, 2021 WL 3080225 (D.S.D. July 21, 2021) .... 3

*Friends of the Earth, Inc. v. Laidlaw Envtl. Sys. (TOC), Inc.*,
528 U.S. 167 (2000) .... 6

*Green v. United States Dep't of Just.*,
111 F.4th 81 (D.C. Cir. 2024) .... 1, 4

*Hattler v. Ashton*,
No. 16-cv-04099, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) .................................. 20

*Jacob v. Biden*,
542 F.Supp.3d 938 (N.D. Cal. 2021) ........................................................................ 7

*Jimenez v. Quarterman*,
555 U.S. 113 (2009) ................................................................................................. 10

*Justice v. Uncharted Labs, Inc.*,
2026 WL 1430232 (S.D.N.Y. May 21, 2026) ........................................................ 3, 23

*Kadrey v. Meta Platforms, Inc.*,
2025 WL 744032 (N.D. Cal. Mar. 7, 2025) ................................................................ 8

*Koala v. Khosla*,
931 F.3d 887 (9th Cir. 2019) ..................................................................................... 6

*Langer v. HV Global Grp., Inc.*,
No. 2:21-cv-00328, 2021 WL 4777092 (E.D. Cal. Oct. 12, 2021) ................................. 6

*Lasica v. America Online, Inc.*,
No. 15-cv-4230, 2015 WL 12791495 (C.D. Cal. Sept. 3, 2015) ............................ 21, 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
387 F.3d 522 (6th Cir. 2004) ..................................................................................... 14

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ................................................................................................... 7

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) .................................................................................... 6

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
629 F.3d 928 (9th Cir. 2010) ............................................................................ *passim*

*Montes v. Capital One, N.A.*,
No. 23-cv-04052, 2024 WL 1643698 (N.D. Cal. Apr. 15, 2024) ..................................... 6

*N.Y. Times Co. v. Microsoft Corp.*,
777 F. Supp. 3d 283 (S.D.N.Y. 2025) ......................................................................... 8

*Post University Inc. v. Learneo, Inc.*,
No. 21-cv-1242, 2025 WL 2702043 (D. Conn. Sept. 23, 2025) ...................................... 8

*Raw Story Media, Inc. v. OpenAI*,
756 F. Supp. 3d 1 (S.D.N.Y. 2024) ............................................................................ 9

*Reddit, Inc. v. SerpApi LLC*,
No. 25-cv-8736, 2026 WL 2210094 (S.D.N.Y. July 31, 2026) .......... 1, 7, 8, 16

*Sony Music Ent. v. Uncharted Labs, Inc.*,
No. 24-cv-4777, 2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026) .......... 3, 23, 23

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) .......... 25

*The Intercept Media, Inc. v. OpenAI, Inc.*,
767 F.Supp.3d 18 (S.D.N.Y. 2025) .......... 8, 9

*Ticketmaster L.L.C. v. Prestige Entertainment, Inc.*,
306 F.Supp.3d 1164 (C.D. Cal. 2018) .......... 6, 16

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
507 F.Supp.2d 1096 (C.D. Cal. 2007) .......... 16

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 8

*VidAngel LLC v. ClearPlay, Inc.*,
703 F.Supp.3d 1329 (D. Utah 2023) .......... 10, 11

*Wash. Env't Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013) .......... 7

*Y.H. v. Blizzard Entertainment, Inc.*,
No. 8:22-cv-00998, 2024 WL 5431490 (C.D. Cal. Aug. 14, 2024) .......... 9

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
633 F.Supp.3d 650 (D. Conn. 2022) .......... 3, 4, 18, 24

***STATUTES AND REGULATIONS***

17 U.S.C. § 1201 .......... 1, 4, 11

17 U.S.C. § 1203(a) .......... 3, 10

37 C.F.R. § 201.40(b)(1)(i)(A) .......... 4

***FEDERAL RULES***

Fed. R. Civ. P. 12(b)(1) .......... 6

Fed. R. Civ. P. 12(b)(6) .......... 6

***OTHER AUTHORITIES***

"Access," https://www.merriam-webster.com/dictionary/access (last visited Aug. 5, 2026) .......... 18

U.S. Copyright Office, *1201 Rulemaking: Ninth Triennial Proceeding Recommendation of the Register of Copyrights* (Oct. 2024) .......... 16

U.S. Copyright Office, *Section 1201 of Title 17: A Report of the Register of Copyrights* (June 2017) .......... 20

**INTRODUCTION**

As this Court has recognized, "Congress enacted the [Digital Millennium Copyright Act], 17 U.S.C. § 1201, to 'mitigate the problems presented by copyright enforcement in the digital age.'" *CDK Global, LLC v. Tekion Corp.*, 2025 WL 1939951, at *8 (N.D. Cal. July 15, 2025) (citation omitted). Congress was particularly concerned that "copyright owners [would] hesitate to make their works readily available on the Internet without reasonable assurance that they [would] be protected against massive piracy." S. Rep. No. 105-90 at 8. The DMCA was thus born out of a desire to "facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of American creative genius." *Id.* The DMCA's "anticircumvention provision"—which "operate[s] as a prohibition against digital trespass" by prohibiting any person from "circumvent[ing] a technological measure that effectively controls access to a work"—is critical to Congress's mission. *Green v. United States Dep't of Just.*, 111 F.4th 81, 89 (D.C. Cir. 2024) (quoting 17 U.S.C. § 1201(a)(1)(A)).

YouTube is proof that Congress's vision has been a resounding success. YouTube is perhaps the emblematic example of an online streaming platform that allows copyright owners to make their works "readily accessible" and "available quickly and conveniently via the Internet" to millions of viewers with the peace of mind that their works will be "protected against massive piracy." To guard against digital trespassers, YouTube employs at least five technological protection measures ("TPMs") that individually, and collectively, control access to copyright owners' works by allowing users to stream content *only* from YouTube's website or through the YouTube app, where their views generate revenue for both YouTube and content creators, and preventing users from accessing and downloading the underlying video file for use outside of YouTube's streaming environment. Amended Complaint ("AC") ¶¶ 33–46 (Dkt. 27).

ByteDance circumvented each of YouTube's protective measures to digitally trespass and gain unauthorized access to the video files of tens of thousands of creators, including Plaintiffs. AC ¶¶ 102–18, 159–60. That is exactly the conduct that Section 1201(a)(1)(A) was designed to prohibit. *See Reddit, Inc. v. SerpApi LLC*, 2026 WL 2210094, at *1 (S.D.N.Y. July 31, 2026) ("Congress sought to protect against *mass piracy* by making it unlawful to circumvent, or create products that

circumvent, technological measures implemented to prevent unauthorized access to and infringement of such works").[1] ByteDance then used its unauthorized access to download millions of video files to train its AI model, "MagicVideo." AC ¶¶ 75–84. Put simply, rather than pay Plaintiffs and other creators for their work, ByteDance broke through YouTube's access protections to steal the underlying files needed to create the massive dataset necessary to fuel MagicVideo. And because ByteDance accessed those files by circumventing YouTube's protections rather than through YouTube's authorized player, YouTube, Plaintiffs, and other creators never saw the ad revenue they otherwise would have earned. *Id.* ¶¶ 122–24.

ByteDance offers three arguments for why it should escape liability for its conduct: first, Plaintiffs lack Article III standing; second, Plaintiffs lack statutory standing; and, third, YouTube's TPMs are not "access controls" to begin with, but merely "copy controls." None of these arguments hold water.

To start, ByteDance wrongly claims that Plaintiffs have not "allege[d] an injury traceable to the alleged circumvention of an access control" for purposes of Article III standing. MTD at 6. Not so. Plaintiffs allege that they lost their ability to control, license, or exclude others from using their works, and lost any ad-generated revenue or other monetary value that Plaintiffs would have earned had ByteDance watched Plaintiffs' works through YouTube's authorized player or negotiated a license instead. *See* AC ¶¶ 121–28. Each of Plaintiffs' injuries is directly traceable to ByteDance's circumvention of YouTube's access controls, without which ByteDance would never have been able to access the downloadable video files used to train its AI model.

ByteDance's statutory standing argument fares no better. ByteDance argues that only the purveyor of a technological protection measure may bring a Section 1201(a) claim. But not a single case that ByteDance cites stands for that proposition. If anything, they all confirm that copyright owners can bring Section 1201(a) claims and are typically the *default* plaintiff for asserting such claims. That should come as no surprise because the statute clearly states that "*any person* injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States

[1] Unless otherwise indicated, all emphasis in this brief has been added.

district court for such violation." 17 U.S.C. § 1203(a). That plainly includes rightsholders like Plaintiffs.

ByteDance's third argument is different, and more ambitious. ByteDance claims that YouTube's TPMs are "copy controls," protected by a different statutory provision (Section 1201(b)), and not "access controls" protected by Section 1201(a). Because users can view videos for free on YouTube, ByteDance's theory goes, they already have "access" to the videos and therefore any controls restricting access to the underlying digital files are outside the bounds of Section 1201(a) altogether.

The Ninth Circuit has already squarely rejected ByteDance's theory in *Disney Enterprises v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017). *VidAngel* involved the same kind of "conditional" access ByteDance claims is categorically excluded from Section 1201(a) protection—a system that allows users to view works through a controlled mechanism, but prevents the user from accessing and copying the underlying digital file. *Id.* at 864. The *VidAngel* decision addressed whether a purchaser of DVDs—who, like YouTube users, could watch material through authorized means (*i.e.*, widely available DVD players)—violated Section 1201(a)(1) by decrypting the DVD's technological measures that controlled access to the DVD's underlying files. *Id.* at 862. The Ninth Circuit held that "us[ing] . . . software to decrypt the TPMs to obtain a digital copy" of the underlying video file "is exactly like 'breaking into a locked room in order to obtain a copy of a [movie]'" and violated Section 1201(a). *Id.* at 864–85 (citation omitted). It made no difference that the DVD purchaser already could watch the films at issue. It should make no difference here either—especially on a motion to dismiss.

*VidAngel* is not an outlier. ***Every*** district court to consider the issue after *VidAngel* has refused to hold, as a matter of law, that YouTube's TPMs fall outside Section 1201(a). *See Sony Music Entertainment v. Uncharted Labs Inc., d/b/a Udio.com*, 2026 WL 1019199, at *3 (S.D.N.Y. Apr. 15, 2026); *Justice v. Uncharted Labs, Inc. d/b/a Udio.com*, 2026 WL 1430232, at *3 (S.D.N.Y. May 21, 2026); *Cordova v. Huneault*, 817 F.Supp.3d 819, 833–35 (N.D. Cal. 2026); *Edland v. Basin Elec. Power Coop.*, 2021 WL 3080225, at *6 (D.S.D. July 21, 2021); *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F.Supp.3d 650, 676 (D. Conn. 2022). ByteDance asks for an

extraordinary departure from settled law to resolve this case on the pleadings alone, without any factual record or discovery. The Court should decline.

At this stage, Plaintiffs need only plausibly allege that their works are protected by a "technological measure" that "effectively controls access," and that ByteDance circumvented that measure to reach Plaintiffs' works. They have done both. ByteDance's motion should be denied.

## **BACKGROUND**

### I. The Digital Millennium Copyright Act and Section 1201(a)

The DMCA was a response to the Internet's rapid growth. Congress enacted the DMCA to "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works," S. Rep. No. 105-190, at 8, and to "ensure a thriving electronic marketplace for copyrighted works on the Internet," H.R. Rep. No. 105-551(I), at 9–10; *see also id.* at 10 ("When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed over the Internet.").

Thus, Section 1201 was born. It "'backed with legal sanctions' copyright owners' use of 'digital walls' to protect their copyrighted works from piracy." *Green*, 111 F.4th at 89 (citation omitted). Those walls, called technological protection measures, or "TPMs," limit both the use of copyrighted works and access to them. *Id.*

Congress understood that Section 1201(a) could sweep in some noninfringing fair uses along with the piracy it targeted. H.R. Rep. No. 105-551 (II), at 36. For this reason, Congress built in statutory and regulatory exemptions. *See, e.g.*, 17 U.S.C. § 1201(d). And Congress created a rulemaking process to keep pace with the ever-changing nature of technology. "Under Section 1201(a)(1)(C), the Librarian of Congress conducts a triennial rulemaking proceeding to grant new exemptions to people who are likely to be 'adversely affected' by the anticircumvention provision in their ability to make noninfringing fair uses of copyrighted materials." *Green*, 111 F.4th at 90.[2]

[2] Notable exemptions include, for example, an exemption that allows the circumvention of TPMs for the purpose of excerpting "short portions of . . . motion pictures . . . [f]or the purpose of criticism or comment . . . [f]or use in documentary filmmaking, or other films where the motion picture clip is used in parody or for its biographical or historically significant nature" (codified at 37 C.F.R. 201.40(b)(1)(i)(A)).

No exemption covers what happened here: mass circumvention to download millions of YouTube videos for commercial use. ByteDance has not sought such an exemption, and it has not received one.

## II. YouTube and Access Restrictions

YouTube is perhaps the most potent example of how the careful balance struck by Section 1201(a) has helped foster the "thriving electronic marketplace" that Congress intended. Rightsholders—from major studios to independent creators like Plaintiffs—upload their content for streaming and rely on YouTube's ad-supported model for revenue. AC ¶¶ 122–24.

What makes YouTube attractive to rightsholders is the control they retain through the platform's content-sharing process. A creator can upload content for streaming through YouTube's authorized, ad-supported player while still controlling how their content is viewed and used. AC ¶¶ 9, 36, 120. YouTube's Terms of Service expressly prohibit users from "access[ing], reproduc[ing], download[ing], distribut[ing], transmit[ting], broadcast[ing], display[ing], sell[ing], licens[ing], alter[ing], modify[ing] or otherwise us[ing] any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders." *Id.* ¶ 70 n.3.

The Complaint alleges that YouTube employs at least five TPMs—the rolling cipher, IP-based blocking and rate limiting, session-bound, short-lived URLs, CAPTCHA challenges, and proof-of-origin tokens—that enforce its Terms of Service and are intended to protect the video files underlying its streaming content. *Id.* ¶¶ 40–45, 50–64. These TPMs are described in detail below. *See infra* at 11–17.

## III. ByteDance's Circumvention of YouTube's Access Restrictions

Plaintiffs allege that ByteDance deliberately circumvented YouTube's TPMs to gain unauthorized access to the underlying data files that are otherwise inaccessible to the public. AC ¶¶ 4–7, 47–49, 99–115. ByteDance scraped millions of copyrighted videos from YouTube to feed, train, improve, and commercialize its generative AI model, "MagicVideo," and later, "Seedance," which allow users generate videos from text and image prompts. *Id.* ¶¶ 1–3. On information and belief, ByteDance used several tools and methods to do so, such as yt-dlp and IP rotation. *Id.* ¶¶

58–60, 63, 102–05. Descrambling tools like yt-dlp automate stream ripping—a process that involves automatically accessing audio and video files directly from a website's servers rather than viewing content through the site's authorized player—by deciphering YouTube's rolling cipher and extracting the underlying files from YouTube's servers. *Id.* ¶¶ 63, 97–98, 102–05. IP rotation uses virtual machines to cycle through IP addresses and dodge YouTube's blocking and monitoring systems. *Id.* ¶¶ 58–59. Through measures like these, ByteDance circumvented YouTube's TPMs and gained unauthorized access to Plaintiffs' and the putative Class's content. *Id.* ¶¶ 97–115.

**LEGAL STANDARD**

On a motion to dismiss under Rule 12(b)(6), a court must "accept the complaint's well-pleaded factual allegations as true, and construe all inferences in the plaintiff's favor[.]" *Koala v. Khosla*, 931 F.3d 887, 894 (9th Cir. 2019) (citation omitted). "[T]here are no heightened pleading requirements for a DMCA circumvention claim. [A plaintiff] only needs to allege facts that, accepted as true, 'state a claim to relief that is plausible on its face.'" *Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F.Supp.3d 1164, 1174 (C.D. Cal. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"A motion to dismiss for lack of Article III standing arises under Rule 12(b)(1)." *Montes v. Capital One, N.A.*, 2024 WL 1643698, at *1 (N.D. Cal. Apr. 15, 2024) (citing *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011)). When a defendant "argues that [a] Plaintiff failed to assert allegations sufficient on their face to invoke federal jurisdiction," the "Court 'must assume the allegations in the complaint are true and draw all reasonable inferences in the plaintiff's favor.'" *Langer v. HV Global Grp., Inc.*, 2021 WL 4777092, at *2 (E.D. Cal. Oct. 12, 2021) (citation omitted).

**ARGUMENT**

**I. Plaintiffs Have Alleged Concrete Injuries Sufficient for Article III Standing**

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends*

*of the Earth, Inc. v. Laidlaw Envtl. Sys. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

ByteDance argues that Plaintiffs have not met the second prong of this inquiry. MTD at 6. But the "fairly traceable" component of the Article III inquiry requires only that a plaintiff demonstrate a "causal connection between the injury and the conduct complained of." *Jacob v. Biden*, 542 F. Supp. 3d 938, 946 (N.D. Cal. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). That connection is easy to draw here. ByteDance's circumvention of YouTube's access controls caused Plaintiffs to lose their ability to control, license, or exclude others from using their works and caused Plaintiffs to lose any ad-generated revenue or other monetary value they would have earned had ByteDance either licensed their works or viewed them through YouTube's authorized player. *See* AC ¶¶ 121–28. ByteDance could not have used Plaintiffs' works to train its AI model without first getting around YouTube's file-level access restrictions. All of Plaintiffs' harms are fairly traced to ByteDance's circumvention of YouTube's access controls, satisfying the causality element for Article III standing. *See Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1141–42 (9th Cir. 2013) ("[A] 'causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible.'" (citation omitted)).

ByteDance further argues that Plaintiffs lack Article III standing because Plaintiffs' alleged harms "are classic copyright injuries" rather than "injuries from circumvention of an access control." MTD at 6. That argument is flawed for reasons already explained: Plaintiffs *have* alleged injuries that stem directly from ByteDance's circumvention of YouTube's access controls. Further, courts have repeatedly held in the DMCA context that injuries traditionally actionable in copyright—such as the loss of control of a plaintiff's works—are sufficient to establish standing.

*Reddit, Inc. v. SerpApi LLC*, 2026 WL 2210094 (S.D.N.Y. July 31, 2026) is illustrative. There, the plaintiff, Reddit, claimed that the defendants had violated Section 1201(a) by circumventing a technological measure employed by Google called "SearchGuard" to access and scrape Reddit-authored content from Google's search engine results pages. *Id.* at *7. The court found Reddit had "plausibly allege[d] an injury 'similar to the harm traditionally actionable in copyright,'" because the defendants' conduct "resembles the unauthorized copying and reproduction that copyright has centrally historically guarded against." *Id.* (citation omitted).

"Accordingly," the court concluded, "Reddit ha[d] plausibly alleged an injury in fact based on defendants' circumvention and scraping of Reddit's own copyrighted works." *Id.* at *8.

*Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032 (N.D. Cal. Mar. 7, 2025) is also instructive. There, the plaintiffs alleged that Meta violated Section 1202(b) of the DMCA by stripping copyright-management information ("CMI") from their works, making it easier to "conceal[] actual infringement of their copyrights." *Id.* at *1. Meta argued, as ByteDance does here, that the plaintiffs' alleged injury—copyright infringement—did not "suffice for standing because the DMCA protects different 'interests' than traditional copyright law, and standing requires an injury that is closely related to a harm traditionally recognized as providing a basis for a lawsuit." *Id.* The court rejected this argument. As Judge Chhabria explained, "whether the DMCA seeks to prevent the exact injuries the plaintiffs allege is a separate question from whether the plaintiffs have been concretely injured by [defendant's conduct]. Article III standing requires that the injury to the plaintiff—not their cause of action or the statute under which it arises—have a close relationship to a traditional harm." *Id.* at *1 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)); *see also N.Y. Times Co. v. Microsoft Corp.*, 777 F.Supp.3d 283, 312 (S.D.N.Y. 2025) ("The 'inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their *asserted injury*,' not the asserted cause of action" (quoting *TransUnion*, 594 U.S. at 417)).

*Kadrey* involved a different provision of the DMCA, but its logic applies here. As in *Kadrey*, Plaintiffs' alleged harms—lost control over their works and lost compensation for them—closely resemble the traditional property-based harms recognized in copyright law. Several courts, including *Kadrey*, have found that this harm suffices for Article III standing in the DMCA context. *See, e.g.*, *The Intercept Media, Inc. v. OpenAI, Inc.*, 767 F.Supp.3d 18, 27 (S.D.N.Y. 2025) (noting that the plaintiff's "claims [under Section 1202(b) of the DMCA] implicate the same kind of property-based harms traditionally actionable in copyright," and that "[t]he DMCA adds another stick to the bundle of property rights already guaranteed to an author in her work under traditional copyright law"); *N.Y. Times*, 777 F.Supp.3d at 312 (explaining that "[f]or both DMCA and traditional copyright claims, the harm involves an injury to 'an author's property right in his original work of authorship,'" which is a concrete injury for Article III standing); *Post University Inc. v.*

*Learneo, Inc.*, 2025 WL 2702043, at *5 (D. Conn. Sept. 23, 2025) (same).

ByteDance relies on *Raw Story Media, Inc. v. OpenAI*, 756 F.Supp.3d 1 (S.D.N.Y. 2024), a case solely about § *1202* claims that is currently on appeal to the Second Circuit, and which reached a conclusion opposite to *Kadrey*, *the Intercept Media*, *N.Y. Times*, and *Learneo*. *Id.* at *4. But even if *Raw Story* were good law, none of its reasoning has any relevance here. The court held that the plaintiffs lacked standing to assert a Section 1202 claim because it was "not convinced that the mere removal of identifying information from a copyrighted work—absent dissemination—ha[d] any historical or common-law analogue." *Id.* at 6. This is not a case about mere removal of identifying information. As Plaintiffs allege, ByteDance accessed millions of video files and "initiate[d] millions of individual downloads of protected YouTube content, *all without authorization or compensation*, all in violation of YouTube's TPMs, and all for the commercial purpose of building its foundational video models." AC ¶ 95. Plaintiffs' alleged harms—stemming from the unauthorized and uncompensated use of their licensable works—are textbook injuries "traditionally actionable in copyright." *Intercept Media*, 767 F.Supp.3d at 27.

In fact, none of the other cases ByteDance cites supports its sweeping assertion that "[c]ourts addressing DMCA claims have . . . rejected attempts to establish standing through injuries untethered from the specific alleged statutory violation." MTD at 5–6. Two cases do not even involve a DMCA claim. *See Callahan v. Ancestry.com, Inc.*, 2021 WL 2433893 (N.D. Cal. June 15, 2021) (no DMCA claim); *Y.H. v. Blizzard Entertainment, Inc.*, 2024 WL 5431490 (C.D. Cal. Aug. 14, 2024) (no DMCA claim). And the only other case, *Doe 1 v. GitHub, Inc.*, 672 F.Supp.3d 837, 850 (N.D. Cal. 2023) (also currently on appeal), is inapposite. In *GitHub*, the court held that the plaintiffs lacked standing to assert a claim for retrospective damages (but held that they *did* have standing to assert a claim for injunctive relief) because the plaintiffs did "not allege that they themselves have suffered the injury they describe," and had only alleged a risk of potential "future harm," which "alone [was] not sufficiently concrete to confer standing for damages." *Id.* at 850–51. Here, by contrast, the Plaintiffs allege that they themselves suffered the alleged injuries. AC ¶¶ 118–28.

Because Plaintiffs have alleged concrete harms traceable to ByteDance's alleged DMCA

violation, Plaintiffs have Article III standing.

## II. The Plain Text of the DMCA Squarely Forecloses ByteDance's Statutory Standing Argument

ByteDance argues that Plaintiffs lack statutory standing because, in its view, "statutory standing flows from ownership or control of the technological measure allegedly circumvented—not merely ownership of protected content hosted on a third-party platform." MTD at 7. In other words, while YouTube could sue, Plaintiffs cannot.

The statute's plain language forecloses that argument. The DMCA provides that "*any person* injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation." 17 U.S.C. § 1203(a). That plainly includes rightsholders like Plaintiffs, regardless of whether they own or control the technological measures that ByteDance circumvented. *See MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 944 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011) ("1201(a) prohibits the circumvention of any technological measure that effectively controls access to a protected work *and grants copyright owners* the right to enforce that prohibition"). Plaintiffs are persons injured by ByteDance's violation of Section 1201(a)(1)—they lost their ability to control the use of their works and they lost the ad-generated revenue and other monetary value they would have earned had ByteDance either licensed their works or viewed them through YouTube's authorized player. AC ¶¶ 122–28. The Court need not, and should not, go beyond the statute's plain text. *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("It is well established that, when the statutory language is plain, we must enforce it according to its terms."); *see also Cordova v. Huneault*, 817 F.Supp.3d 819, 833 (N.D. Cal. 2026) (rejecting argument that the owner of the copyrighted works lacked statutory standing to bring a Section 1201(a) claim).

Neither of the two cases Bytedance cites stands for the proposition that "[d]ecisions interpreting Section 1201 support the conclusion that statutory standing flows from ownership or control of the technological measure allegedly circumvented." MTD at 7. In both *VidAngel LLC v. ClearPlay, Inc.*, 703 F.Supp.3d 1329 (D. Utah 2023) and *Echostar Satellite L.L.C. v. Viewtech, Inc.*, 543 F.Supp.2d 1201 (S.D. Cal. 2008), the defendants argued that plaintiffs lacked standing

because they were *not* the copyright owners—the exact opposite of what ByteDance argues here. *See ClearPlay*, 703 F.Supp.3d at 1334 ("VidAngel argues that the DMCA does not extend a private cause of action to ClearPlay *because ClearPlay is not the copyright owner* . . . .); *Echostar Satellite*, 543 F.Supp.2d at 1205 ("Viewtech argues in its moving papers that EchoStar is *not the copyright owner*, and thus lacks standing . . . ."). Both courts held that standing is not limited to copyright owners alone. *See ClearPlay*, 703 F. Supp. 3d at 1335; *Echostar Satellite*, 543 F. Supp. 2d at 1205–06. Neither case says copyright owners are excluded if they do not own the TPMs at issue.

Permitting ByteDance to escape liability under Section 1201 simply because Plaintiffs and other content creators delegated technical implementation of access controls to YouTube would gut the statute's protections for every creator who relies on a third-party platform to safeguard their work. The text of Section 1201 does not support that result. Because Plaintiffs are "person[s]" "injured by" Bytedance's alleged violation of Section 1201(a), Plaintiffs have statutory standing.

**III. Plaintiffs Have Alleged Circumvention of Access Controls Under Section 1201(a)**

ByteDance's core theory is that access controls are limited to measures that "prevent[] a user from viewing or opening the work at all," like passwords or paywalls. MTD at 9. Because anyone can watch Plaintiffs' videos on YouTube, ByteDance concludes that Plaintiffs have no Section 1201(a) claim because the TPMs at issue are only copy controls. That theory has no foundation in the statutory text or the legislative history and has been squarely rejected by numerous courts, including the Ninth Circuit. It is also wrong on the facts Plaintiffs allege: even watching a video on YouTube requires satisfying technological measures.

**a. Plaintiffs Have Alleged TPMs that Effectively Control Access to Their Works**

It's important to understand at the outset how Plaintiffs allege the TPMs at issue function, particularly because ByteDance's motion repeatedly mischaracterizes Plaintiffs' allegations about the TPMs.

The DMCA provides that "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). That is precisely how Plaintiffs allege YouTube's TPMs work. Before

anyone can reach Plaintiffs' works—whether to view those works on YouTube's streaming platform *or* to reach the underlying video file, users first encounter a variety of gatekeeping mechanisms that they must satisfy through the application of information. Those TPMs are the "rolling cipher," the "proof-of-origin" tokens, and the short-lived, session-bound URLs. AC ¶¶ 52–64. YouTube also employs TPMs that can *revoke* access to YouTube if it suspects suspicious activity—like Bytedance's "[l]arge-scale scraping operations." *Id.* ¶ 58. Those TPMs are called "IP blocking" and "CAPTCHA challenges." *Id.* ¶¶ 53–54, 57–60.

Start with the "rolling cipher." The "rolling cipher" is, in effect, a digital lock that constantly changes its combination. As Plaintiffs allege, YouTube maintains two different URLs for any given video: the page URL is the webpage where the video streaming occurs, and the file URL is for the underlying video file itself. AC ¶ 51. The file URL is encrypted using a complex and periodically changing algorithm called the rolling cipher. *Id.* ¶¶ 50–51. Users who wish to play a video must first receive what is called a "client," *i.e.* YouTube's player software. *Id.* ¶¶ 45, 50. That software, which is sent to the user's browser, uses a decryption routine to authenticate requests and deliver content only through YouTube's streaming environment. *Id.* ¶¶ 50–51. In other words, the player software decrypts the rolling cipher so the video can stream, but it does so only for playback, not for downloading. The underlying video file remains under lock and key. Users' access to Plaintiffs' works is thus controlled: the rolling cipher only authorizes users to view Plaintiffs' works from the YouTube streaming platform.

Proof-of-origin tokens similarly control access to Plaintiffs' works. YouTube's official player software generates tokens which are, in effect, keys tied to the requesting session that accompany the request for the video file. YouTube's servers validate these tokens before delivering the video stream. AC ¶¶ 61–64. Because proof-of-origin tokens are generated exclusively within YouTube's authorized player environment, software operating outside that environment cannot obtain valid tokens through ordinary means. *Id.* ¶ 62. To retrieve audiovisual files at scale, automated scraping tools must therefore extract, replicate, or spoof the token parameters required for server authentication. *Id.* ¶ 63. Proof-of-origin tokens thus effectively control access by conditioning delivery of copyrighted works on proof that the requester is operating within

YouTube's authorized playback environment. *Id.* ¶ 64.

YouTube further controls access by issuing only session-bound, short-lived URLs. These URLs include authorization parameters that expire, after which the server refuses to honor them. In simple terms, YouTube does not just deliver the full video to every user seeking to view content. It sends the video through temporary links, and only lets it be played using its own system, while checking each step along the way. AC ¶¶ 55–56. To stream the full video, a user therefore must continuously apply the processes described above—executing YouTube's proprietary decryption code to "unlock" the rolling cipher and sending back proof-of-origin tokens—which the user can only do if they are trying to view the video in an authorized manner on YouTube's platform. Anyone who wants to access the underlying video file itself so that they can download and view the file outside of YouTube must circumvent these measures. *Id.* ¶ 56.

These TPMs are access controls akin to those at issue in *Disney Enterprises v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017). In *VidAngel*, the plaintiffs had made their works available on DVDs and Blu-ray discs which contained encryption measures called "CSS" and "AACS." 869 F.3d at 853. To access the disc's contents, those encryption measures had to first be decrypted. Only a DVD player from a licensed manufacturer could "lawfully decrypt [the] disc's content, and then only for playback, not for copying." *Id.* The defendant, VidAngel, circumvented the DVD's encryption measures to access and copy the discs' contents without using an authorized player. The Ninth Circuit held that the DVD's encryption measures were access controls. *Id.* at 865.

YouTube's TPMs operate similar to the encryption measures on DVDs. To stream a YouTube video, the rolling cipher must first be decrypted and YouTube's servers must receive a valid token. Only YouTube's player software contains the keys to descramble the rolling cipher and to provide the proof-of-origin tokens, just as only an authorized DVD player contained the keys to decrypt the DVD's encryption measures. But even then, the ordinary user has only gained access to the webpage where the video playback occurs, not to download the underlying video file, just as the ordinary user in *VidAngel* only gained access to the DVD's contents for playback, not for copying. To gain access to the underlying video file, ByteDance, like VidAngel, had to circumvent YouTube's TPMs. Had ByteDance proceeded through the authorized path of access, they would

have only ever been able to view the video from YouTube's streaming environment, just as had VidAngel proceeded through the authorized path of access, it would have only been able to view the DVD's contents with an authorized DVD player.

ByteDance claims that none of these measures are "access measures" because they do not regulate "threshold access to the videos themselves" and are not "encountered by every viewer or in the ordinary course of viewing a YouTube video." MTD at 14, 17. But that is, at best, a disputed question of fact, as Plaintiffs *do* allege that users encounter YouTube's TPMs in the ordinary course of watching a video. Plaintiffs allege that "[v]iewing a work on YouTube . . . requires the application of a sequence of authorized processes, including the issuance and validation of session-specific tokens, execution of player-side instructions, and reconstruction of segmented media streams into a continuous audiovisual experience." AC ¶ 44. While this may occur behind the scenes—just like the DVD player's authorized decryption of the video file in *VidAngel*—an ordinary user nevertheless must, as alleged in the complaint, satisfy the technological protection measure in order to watch a video. Each "controls a user's initial access to a YouTube video," *contra* MTD at 17, by limiting the user's access to streaming the video on YouTube's platform, where YouTube and content creators like Plaintiffs can generate revenue from clicks and views. If a user wishes to access the underlying video file, she must circumvent these measures.

YouTube's TPMs are thus different from those at issue in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004). *See* MTD at 15. Lexmark made printers and toner cartridges. *Id.* at 530. The question in *Lexmark* was whether an authentication sequence was a technological measure that effectively controlled access to a Lexmark printer's software, called the Printer Engine Program Code. *Id.* at 546–47. The Sixth Circuit said no, because a user did not need to encounter the authentication code to access the Printer Engine Program Code; anyone could "read the literal code of the Printer Engine Program directly from the printer memory, with or without the benefit of the authentication sequence." *Id.* at 546. "No security device, in other words, protect[ed] access to the Printer Engine Program Code and no security device accordingly must be circumvented to obtain access to that program code." *Id.* at 547.

That is nothing like this case. Here, there is no way for the ordinary user to access Plaintiffs'

works—whether to view on YouTube's platform or to access the underlying video file—without encountering TPMs like the rolling cipher and proof-of-origin tokens. As *VidAngel* makes clear, the fact that YouTube offers an *authorized* way to view Plaintiffs' works does not mean that ByteDance did not circumvent an access control when it circumvented YouTube's TPMs to gain access to the underlying video file. *See* 869 F.3d at 865.

In addition to the rolling cipher, proof-of-origin tokens, and short-lived, session-bound URLs, YouTube also employs two measures—IP blocking and CAPTCHA challenges—that can *revoke* access to YouTube's platform. As Plaintiffs allege, YouTube monitors network behavior and blocks IP addresses that exhibit patterns consistent with abusive behavior, so that the IP addresses lose access to the entire YouTube platform. AC ¶¶ 53–54. YouTube also deploys CAPTCHA challenges (tests "often requiring identification of objects with grainy images") when automated or suspicious activity is detected. *Id.* ¶¶ 57–60. These challenges "perform a gatekeeping function by prohibiting a certain type of user (a bot) from accessing the platform and the audiovisual works hosted on it." *Id.* ¶ 57.

ByteDance argues that neither CAPTCHA nor IP blocking counts as access controls because they only "regulate continue[d] platform use after YouTube detects abnormal activity." MTD at 14; *see also id.* at 15. But the Ninth Circuit, in *MDY*, made clear that measures that *revoke* access can also be access controls under Section 1201(a). *MDY*, 629 F.3d at 943 ("[I]n our view, an access control measure can both (1) attempt to block initial access and (2) *revoke access* if a secondary check determines that access was unauthorized."). *MDY* involved a TPM called "Warden," which was designed to keep bots off World of Warcraft servers. 629 F.3d at 942. Warden functioned by first "scan[ning] a [player's] computer's RAM prior to allowing the player to connect to [World of Warcraft's] servers." *Id.* If the Warden software detected a bot through that scan, it would not allow the player to connect and play. But if the bot was able to get through and access, Warden had a secondary component that ran "periodically in the background on a player's computer when it is [was] connect to WOW's servers" which "look[ed] for patterns of code associated with known bots or cheats." *Id.* If Warden "detect[ed] a bot or cheat," it would "boot[] the player from the game." *Id.* The Ninth Circuit held that Warden was "an effective access control

measure" with respect to certain copyrighted work. *Id.* at 954.

YouTube, like Warden, monitors network behavior and employs TPMs, like IP blocking and CAPTCHA challenges that monitor behavior and will boot unauthorized users from the YouTube platform.

Indeed, Courts regularly recognize TPMs like CAPTCHA as access measures. *See, e.g.*, *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F.Supp.2d 1096, 1112 (C.D. Cal. 2007) ("[B]ecause CAPTCHA 'in the ordinary course of its operation, requires the application of information . . . to gain access to the work,' it is a technological measure that regulates access to a copyrighted work."); *Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F.Supp.3d 1164, 1174 (C.D. Cal. 2018) (same); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F.Supp.2d 1039, 1056 (N.D. Cal. 2010) (same). Judge Engelmayer's recent decision in *Reddit v. SerpApi* is particularly on point. There, the court considered whether "SearchGuard," a TPM used by Google, was an access control. SearchGuard works by "examin[ing] each [Google] search query to determine whether it is coming from a recognized or unrecognized source," and "[i]f the source is unrecognized, SearchGuard sends a challenge or CAPTCHA that requires the browser to return information about the user generating the inquiry." 2026 WL 2210094, at *3, *16. The court concluded that SearchGuard was "a 'process' required 'to gain access to the work,'" because "[i]t erects a gate between users and Google [search engine results pages], which in the ordinary course, can be opened only by human users but which keeps out automated users," and "thereby controls access . . . [by] restricting such access to human users who cannot engage in mass scraping of data." *Id.* at *16 (citing *MDY*, 629 F.3d at 954). The very same is true of YouTube's CAPTCHA and IP blocking measures.

In the face of this authority, ByteDance relies on a single out-of-circuit decision about grocery store coupons, *CouponCabin LLC v. Savings.com, Inc.*, 2016 WL 3181826, at *6 (N.D. Ind. June 8, 2016).[3] But that case does not stand for the proposition that "traffic-management and

[3] ByteDance also cites in a footnote a report from the U.S. Copyright Office that it claims "rejected the argument that rate-limit enforcement systems effectively control access to a work." MTD at 14 n.13. But the Copyright Office repeatedly emphasized the limited amount of information it had before it to assess whether rate-limit enforcement systems effectively control access to a work. *See, e.g.*, Section 1201 Rulemaking: Ninth Triennial Proceeding Recommendation of the Register of Copyrights, at 125 (Oct. 2024) ("IP address rotation, *based on the thin record before the Office*,

anti-abuse systems are not access controls under Section 1201(a)," as ByteDance asserts. MTD at 14. In *CouponCabin*, the plaintiff had discovered "a marked increase in the amount of its unique content appearing on a number of competing websites," and hired a security provider to block traffic "from certain . . . service providers identified as being used particularly heavily by the Defendants to conduct scraping activities." *Id.* at *1. In response, the defendants simply switched to other servers that hadn't been blocked. *Id.* at *6. The court dismissed the Section 1201(a) claim because the plaintiff's TPM was plainly ineffective, not because IP blocking is *per se* not an access control. *Id.* at *6. And even if *Couponcabin* could be read to stand for that proposition (it can't), it is neither binding on this court nor persuasive. The Ninth Circuit's decision in *MDY* is both.[4]

Because YouTube's TPMs are precisely the type of measures that the Ninth Circuit already has held are access controls under Section 1201(a), ByteDance's motion should be denied.

**b. YouTube's TPMs Are Access Controls Even If They Do Not Prevent Users from Viewing the Works on YouTube's Platform**

ByteDance argues that the aforementioned TPMs are not access controls because they do not "prevent[] users from accessing or perceiving the videos in the first instance." In other words, because Plaintiffs' works are viewable on YouTube's platform, users have "access to [the] work," and Section 1201(a) offers nothing more for the underlying video file. MTD at 11. As discussed, ByteDance is wrong—Plaintiffs have alleged that YouTube employs TPMs that require users to apply a process to gain *any* access to the works, including to stream. Regardless, Plaintiffs do not even need to allege that YouTube's TPM "prevent[] a user from viewing or opening the work at all" to assert a Section 1201(a) claim. They need only allege that YouTube's TPMs *effectively control* how the user accesses Plaintiffs' works.

Start with the plain language of the statute. The statute says "access"; not "perceive,"

---

does not *appear* to involve circumvention of an effective control").

[4] ByteDance also appears to assert that this Court's analysis in *CDK Global, LLC v. Tekion Corp.*, 2025 WL 1939951 (N.D. Cal. July 15, 2025) supports the conclusion that YouTube's measures "are outside the scope of Section 1201(a)" (although it does not further explain that assertion). *See* MTD at 2. But *CDK* involved an IP-access restriction, and this Court agreed that it was plausibly an access control. *See id.* at *6, 8–9.

"view," or "watch." "Access" includes the "freedom or ability to obtain or make use of something." *See Access*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/access (last visited Aug. 5, 2026); *see also Yout*, 633 F.Supp.3d at 664 (citing Merriam Webster and concluding that TPMs "that restrain a YouTube user's freedom or ability to access the location where downloadable files are stored and download them" are plausibly access controls). That is exactly what Plaintiffs allege: that YouTube employed TPMs restricting users' "freedom or ability to obtain" (*i.e.* "access") the underlying audiovisual files, and that ByteDance circumvented those controls to "obtain[] millions of videos from YouTube's platform." AC ¶ 160.

Further, the plain text of the statute says "effectively *controls* access," not "effectively *prevents* access." As the Ninth Circuit explained, "[t]he statutory definition of the phrase 'effectively control access to a work' does not require that an access control be strong or circumvention-proof. Rather, it requires an access control measure to provide some degree of control over access to a copyrighted work." *MDY*, 629 F.3d at 954 n.17 (citation omitted).

*VidAngel* forecloses ByteDance's narrow interpretation of Section 1201(a). VidAngel made the same exact argument that ByteDance makes here—that because plaintiffs could *view* the works, the DVD's TPMs were not access controls, but instead "use controls" (*i.e.* "copy controls"). The Ninth Circuit disagreed: "[n]othing in the legislative history [of the DMCA] suggests that VidAngel did not circumvent an access control simply because there are authorized ways to access the Studios' works." 869 F.3d at 865. The Ninth Circuit concluded that the plaintiff's TPMs—which were designed to prevent the user from accessing and copying the disc's contents—were access controls governed by Section 1201(a). *Id.*

The facts alleged here are materially similar. YouTube users can watch Plaintiffs' works, but YouTube's TPMs limit their access: They can watch the videos only on YouTube's streaming platform. Likewise, the DVD purchaser in *VidAngel* was authorized to watch the copyrighted movie as many times as she wanted, provided she used the authorized mechanism, a licensed DVD player.

The legislative history of the DMCA also forecloses ByteDance's narrow interpretation of Section 1201(a). In enacting Section 1201(a), Congress "was particularly concerned with encouraging copyright owners to make their works available in digital formats such as 'on-demand'

or 'pay-per-view,' which allow consumers effectively to 'borrow' a copy of the work for a limited time or a limited number of uses." *MDY*, 629 F.3d at 947. As the House Commerce Committee warned, "[t]o operate in this environment, content providers will need both the technology to make new uses possible and the legal framework to ensure they can protect their work from piracy." *Id.* (quoting H.R. Rep. No. 105-551(II), at 23 (1998)). Congress clearly had in mind that Section 1201(a) would not just encompass access controls that prevent users from viewing the works (such as paywall), but also those that protect streamers from piracy (by preventing users from accessing and downloading the underlying video file, even if they could otherwise *view* the work by streaming it). If Section 1201(a) did not extend to this latter type of "access control," then copyright owners like Plaintiffs would never make their works available for on-demand streaming—on YouTube or any streaming platform—contrary to Congress's intent.

Against the statutory language, the Ninth Circuit's controlling authority, and legislative history, ByteDance cites to two out-of-circuit cases for the premise that a "technological measure, in order to be effective, must prevent *all* forms of access to a work." MTD at 17. But *Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365 (5th Cir. 2020), stands simply for the premise that a TPM is not an access control if it does not "control[] access to the [work] *at all*." *Id*. at 377; *see also id.* at 376 (holding that the plaintiff's TPMs did not control access to the plaintiff's "database schema" because the "data was stored in an *open database file* to allow users to query the database using off-the-shelf products."). And the same is true of *Avaya, Inc. v. Telecom Labs, Inc.*, 2012 WL 13035096 (D.N.J. May 1, 2012), where there was no protection measure that guarded "access [to] the copyrighted aspect of the [plaintiff's] software," and so no violation of Section 1201(a). *Id.* at *8. Both cases state the unremarkable point that if Plaintiffs' video files sat in an open database for anyone to access and download, Plaintiffs would have no Section 1201(a) claim. But that is not this case. Instead, the video files remain in "a locked room," which ByteDance needed to break into in order "to obtain a copy of [the works]." *VidAngel*, 869 F.3d at 865.

**c. YouTube's TPMs Can Be Both Access and Copy Controls**

ByteDance further argues that because the alleged TPMs restrict downloading, they are copy controls, not access controls. *See, e.g.*, MTD at 10. But this both mischaracterizes the

allegations of the Complaint and is wrong on the law. First, the Complaint alleges that the TPMs at issue restrict all forms of access, not solely downloading. ByteDance would still be liable for a Section 1201(a) claim had it circumvented the rolling cipher, for example, to stream Plaintiffs' videos from YouTube's servers outside of the authorized playback environment, an act that would similarly deprive Plaintiffs of advertising revenue. That ByteDance chose to download videos instead of watching them after it circumvented the TPMs makes no difference.

Second, the Ninth Circuit has squarely rejected ByteDance's assertion that there is a rigid, unyielding, distinction between access controls governed by Section 1201(a) and use controls governed by Section 1201(b). In *VidAngel*, the Ninth Circuit explained that "the statute does not provide that a TPM cannot serve as both an access control and a use control. . . . [W]hen a defendant decrypts the TPMs and then also reproduces that work, it is liable for both circumvention in violation of § 1201(a)(1)(A) and copyright infringement in violation of § 106(1)." 869 F.3d at 864. Similarly, in *MDY*, the Ninth Circuit acknowledged that a TPM could "both (1) control[] access and (2) protect[] against copyright infringement." 629 F.3d at 946. Indeed, even the Copyright Office has its own term for TPMs that do both jobs at once: "merged access and copy controls." *See* U.S. Copyright Office, *Section 1201 of Title 17: A Report of the Register of Copyrights*, at 126 (June 2017).[5]

Against this authority, ByteDance offers two unpublished decisions that pre-date *VidAngel* for the proposition that "courts have repeatedly applied [the] distinction" between access and copy controls. MTD at 11. Neither is persuasive or relevant here.

*Hattler v. Ashton*, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) recognized a sweeping rule that Section 1201(a) does not apply where the "[w]orks are accessible to the public on many

---

[5] In its report, the Copyright Office further wrote that "[a] few commenters proposed that in ***the many cases*** *where access controls and copy controls are merged*, the rulemaking should treat the inquiry into the adverse effects on noninfringing uses differently," such that "obtaining an exemption" under the DMCA "should be easier where the TPM at issue is merged." *Id*. The Office rejected this argument, noting that "[t]he Office believes that section 1201(a)(1) is best read as protecting the integrity of access controls even where prohibited conduct would not be infringing." *Id.* at 126–27.

websites." *Id.* at *8. But *Hattler* involved remarkably sparse (in fact, completely nonexistent) allegations about the technological measures at issue. While the plaintiff claimed that the defendants "circumvented the technological measures on [Plaintiff's] sites," he did not allege *anything* about what those technological measures were, nor did he allege that users encountered those measures before accessing and copying his works. *See* Second Amended Complaint, 2:16-cv-04099-GHK-KS (C.D. Cal. Nov. 21, 2016) (Doc. No. 26)).[6]

More importantly, *Hattler* predates *VidAngel* (as does *Lasica*, addressed below) and to the extent *Hattler* is premised on the view that works that can be publicly viewed, but not copied or downloaded, cannot be the subject of a Section 1201(a) circumvention claim, it does not survive *VidAngel*. In fact, the *Hattler* court acknowledged that the defendants did "not dispute that, in order to download the [plaintiff's] works for their use . . . they were required to circumvent technology expressly *designed to prevent that form of access*." *Id.* at *6. Under *VidAngel*, this should have compelled the conclusion that the TPMs at issue were access controls, as the defendants conceded the TPMs controlled access to the plaintiff's works by providing a form of *authorized* access to plaintiff's works (viewing them from the streaming platforms) while preventing access to the works in a manner through which they could be downloaded.

*Lasica v. America Online, Inc.*, 2015 WL 12791495 (C.D. Cal. Sept. 3, 2015)—the other case on which ByteDance relies—is a *tentative* order involving a Section 1201(b) claim, *not* a Section 1201(a) claim.[7] *Id.* at *5. Regardless, *Lasica* is distinguishable. There, the defendant had copied a photo from a photo-sharing website. *Id.* at *1. The plaintiff had not alleged that the website employed any TPM to control access to the photograph; the plaintiff had only alleged that the

---

[6] With this opposition brief, Plaintiffs have filed a request for judicial notice. *See* Dkt. 43. The *Hattler* Complaint is attached as Exhibit A to that request.

[7] ByteDance also mischaracterizes the case, stating that "[t]he court made [its] finding in the context of a tentative ruling, *following which* the plaintiff withdrew its DMCA claims." MTD at 12 n.12. This is false as it relates to the Section 1201(a) claims. The plaintiff withdrew his Section 1201(a) claims *before* the court issued its tentative ruling; accordingly, nothing in the decision ByteDance cites addresses the merits of plaintiff's Section 1201(a) claims. Memorandum of Points and Authorities in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss, *Lasica v. Am. Online, Inc.*, No. CV-15-4230-GW (C.D. Cal. Aug. 10, 2015) (Dkt. 24). A copy of the Memorandum is attached as Exhibit B to Plaintiffs' Request for Judicial Notice, Dkt. 43.

photograph was subject to a licensing agreement which "explicitly prohibited the use of the [photograph] for commercial purposes." Amended Compl. and Demand for Jury Trial, *Lasica v. Am. Online, Inc.*, 2:15-cv-04230-GW, 2015 WL 6669503, at ¶¶ 8, 44 (July 14, 2015) (*see* Pls. Request for Judicial Notice, Dkt. 43, Ex. C). Here, by contrast, Plaintiffs allege that ByteDance was not just prohibited from accessing creators' videos by YouTube's Terms of Service, but also that YouTube employed TPMs designed to enforce its Terms of Service.[8]

ByteDance also cites *Lasica* for the premise that "a person who engages in prohibited usage of a copyrighted work to which he has lawful access does not fall afoul of any provision of Section 1201." *See* MTD at 12 (quoting *Lasica*, 2015 WL 12791495, at *5). In other words, ByteDance argues that because it had one form of authorized access to Plaintiffs' works (the ability to view them on YouTube), it could not run afoul of any provision of Section 1201. But *Lasica* relies on *Ass'n for Info. Media & Equip. v. Regents of the Univ. of Calif.*, 2012 WL 7683452, at *9 (C.D. Cal. Nov. 20, 2012) for that premise, which is no longer good authority after *VidAngel*. There, the court held that the defendant did not violate Section 1201(a) when it circumvented technological measures on a DVD to copy its contents because the defendant already "had lawful access to the DVDs." *Id.* at 9. *VidAngel* squarely rejected the argument that because a DVD-purchaser has "lawful access" to the DVD, it is "authorized . . . to decrypt [technological measures] to view the discs' content." 869 F.3d at 863. Rather, the Ninth Circuit said, "lawful purchasers have permission only to view their purchased discs with a DVD or Blu-Ray player licensed to decrypt the TPMs." *Id.* at 863.

The same logic applies here. The public has lawful access to view Plaintiffs' works *from YouTube's streaming platform*, but it does not have permission to access the underlying video files. Just as the TPMs in *VidAngel* were designed to prevent the DVD purchaser from both viewing the DVD through an unlicensed mechanism *and* from accessing and reproducing the underlying video

[8] ByteDance frames Plaintiffs' allegations regarding YouTube's Terms of Service ("TOS") as though Plaintiffs rely on the TOS, standing alone, as a TPM. MTD at 16. Plaintiffs do not allege the TOS is an independent TPM. Rather, the complaint alleges that the TOS "operate *together* with YouTube's TPMs to prevent unlicensed access to creators' videos," and that "[c]ontent creators, including Plaintiffs and Class Members, rely on the TPMs *and* YouTube's Terms of Service in deciding to upload their audiovisual content to YouTube." AC ¶¶ 36, 65.

file saved on the DVD, here YouTube's TPMs are designed to prevent users from viewing the videos outside of YouTube's streaming platform *and* from accessing and reproducing the underlying video file. That YouTube's access controls may *also* be copy controls is no reason to dismiss Plaintiffs' claims.

**d. ByteDance Cannot Overcome the Unbroken Line of Post-*VidAngel* Decisions Denying Motions to Dismiss on YouTube's TPMs**

Finally, ByteDance tries to wave away what it calls a "handful of district court decisions [that] have declined to dismiss Section 1201(a) claims premised on YouTube's TPMs." MTD at 18. But this is not just a "handful" of cases; rather, every single case to consider the issue since *VidAngel* has declined to dismiss Section 1201(a) claims premised on YouTube's TPMs.

In *Sony Music Ent. v. Uncharted Labs, Inc.*, 2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026), an AI developer that stream-ripped YouTube videos argued that YouTube's rolling cipher was a copy control and that the plaintiffs had not pleaded circumvention of an access control—same as ByteDance here. The court denied dismissal. *Id.* at *3. The same court reached the same result in *Justice v. Uncharted Labs, Inc.*, 2026 WL 1430232, at *3 (S.D.N.Y. May 21, 2026).

ByteDance argues that the *Sony* and *Justice* court "misapplie[d] the pleading standard" because the court wrote that "the Complaint does not establish how [YouTube's TPMs] function sufficiently to determine their legal classification," which should have meant that the plaintiffs' anti-circumvention claims failed as a matter of law. MTD at 19 (quoting *Sony*, 2026 WL 1019199, at *3). ByteDance mischaracterizes the court's decisions. In both cases, the court held that the plaintiffs had "plausibly allege[d] that YouTube employs technological measures that regulate access to its content and that Defendant circumvented them under the pleading standard set by Rule 8(a)." *Sony*, 2026 WL 1019199, at *3; *accord Justice*, 2026 WL 1430232, at *3. The court was simply acknowledging a proposition that is true in nearly all cases at this stage: that further factual findings through discovery could ultimately refute the plaintiffs' allegations as a matter of law. *See Justice*, 2026 WL 1430232, at *3 (quoting *Sony*, 2026 WL 1019199 at *3). Just as in *Sony* and *Justice*, Plaintiffs' allegations readily satisfy Rule 8(a), and detailed inquiries into the mechanisms of YouTube's TPMs and ByteDance's act of circumvention are factual questions better left for

discovery, summary judgment, and trial.

ByteDance's attacks on *Cordova v. Huneault*, 817 F.Supp.3d 819 (N.D. Cal. 2026) fare no better. ByteDance mischaracterizes the *Cordova* court as treating "any measure 'intended to prevent unauthorized downloading" as an access control. MTD at 18. That is not what the court held; rather, the court explained that "measures that restrict *access to downloadable files*[] are sufficient for purposes of the second element of a § 1201(a)(1) claim." *Id.* ByteDance also claims that "if *Cordova* was right, *MDY* would have turned out differently because the court there found no access control where the measure was intended to prevent unauthorized game-playing." MTD at 18. That misconstrues *MDY*. The Ninth Circuit never held that a measure "intended to prevent unauthorized game-playing" cannot be an access control. The Ninth Circuit held that the technological measure—which scanned a user's computer before allowing them to connect to the defendant's servers to detect for bots—was not an access control with respect to *certain* copyrightable elements of the video game (the game's source code and certain "visual and audible components of the game") because those elements were already stored on the players' hard drives. *Id.* at 954. A user did not need to connect to the defendant's servers to access these elements and so never would have encountered Warden, the TPM. Here, by contrast, the measures are encountered by users. *See supra* at 11–17. *Cordova*'s holding is perfectly consistent with *MDY*.

Finally, ByteDance correctly notes that *Yout*, 633 F.Supp.3d 650 (D. Conn. 2022) was a declaratory judgment action. But that procedural posture does not mean that *Yout* is not persuasive. In fact, the opposite. As *Yout* accurately explained: "YouTube directs users to stream videos and, by not making a download option readily available on the player page, restrains users' ability to access and copy audio and video files." *Id.* at 669. The court thus rejected the plaintiff's argument that YouTube lacks any access control. *Id.* That reasoning applies with equal force here.

**IV. Plaintiffs Have Sufficiently Alleged the Timing and Nature of YouTube's Technological Protections and ByteDance's Large-Scale Scraping Operation**

In a fleeting sentence in its "factual background" section, ByteDance claims that "Plaintiffs do not allege when [YouTube's] TPMs applied, which TPMs applied to Plaintiffs' videos or what tool(s), if any, [ByteDance] in particular purportedly used to download the videos." MTD at 4. That

argument is baseless. Plaintiffs allege that YouTube had five TPMs, and that ByteDance, in fact, circumvented all of them. AC ¶¶ 97–117. That is more than sufficient to plausibly allege that the TPMs were in existence at the time ByteDance circumvented them.

Further, Plaintiffs allege that, on information and belief, ByteDance used descrambling tools, such as yt-dlp, and IP rotation to circumvent YouTube's TPMs. AC ¶¶ 6, 102–10. A plaintiff may "plead[] facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the [allegations] plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (citation omitted). Both are true here: Only ByteDance possesses information about the tools it used to circumvent YouTube's TPMs, and Plaintiffs' beliefs are based on factual information that makes the allegations plausible. It would have been impossible for ByteDance to scrape hundreds of *millions* of Plaintiffs' and putative Class members' works *without* circumventing YouTube's TPMs which—at that volume—necessarily required the use of descrambling tools and IP rotation. *See, e.g.*, AC ¶¶ 60, 102, 108.

## CONCLUSION

For the foregoing reasons, the Court should deny ByteDance's motion to dismiss. If it concludes that Plaintiffs' claims are insufficiently pleaded, Plaintiffs request leave to amend.

Dated: August 6, 2026

Respectfully submitted,

By: /s/ *Rohit D. Nath*

SUSMAN GODFREY LLP
Rohit D. Nath (SBN 316062)
Michael Gervais (SBN 330731)
SUSMAN GODFREY L.L.P
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067-2906
Telephone: (310) 789-3100
RNath@susmangodfrey.com
MGervais@susmangodfrey.com

Max L. Tribble, Jr. (SBN 326851)
Justin A. Nelson *(Pro Hac Vice* forthcoming)
SUSMAN GODFREY L.L.P
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096

Telephone: (713) 651-9366
MTribble@susmangodfrey.com
JNelson@susmangodfrey.com

Morgan McCollum (admitted *Pro Hac Vice*)
SUSMAN GODFREY L.L.P.
One Manhattan West, Fl. 50
New York, NY 10001
Telephone: (212) 336-8330
MmcCollum@susmangodfrey.com

Rom Bar-Nissim (SBN 293356)
Rom@HeahBarNissim.com
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 432-2836

Jarrett Lee Ellzey (*Pro Hac Vice*)
Tom Kherkher (*Pro Hac Vice*)
Leigh S. Montgomery (*Pro Hac Vice*)
ELLZEY KHERKHER SANFORD
MONTGOMERY LLP
4200 Montrose Street, Suite 200
Houston, TX 77006
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com

*Attorneys for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify this 6th day of August, 2026, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to the attorneys of record, and is available for viewing and downloading.

/s/ *Rohit D. Nath*