PILLSBURY WINTHROP SHAW PITTMAN LLP
ANNE M. VOIGTS (220783)
anne.voigts@pillsburylaw.com
2400 Hanover Street
Palo Alto, California 94304-1113
Telephone: 650.233.4500
Facsimile: 650.233.4545

LAURA C. HURTADO (267044)
laura.hurtado@pillsburylaw.com
KAYVAN M. GHAFFARI (299152)
kayvan.ghaffari@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone: 415.983.1000
Facsimile: 415.983.1200

Attorneys for Defendant
BYTEDANCE INC.

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

TED ENTERTAINMENT, INC., MATT FISHER, and GOLFHOLICS, INC., each individually and on behalf of all other similarly situated,

Plaintiffs,

v.

BYTEDANCE INC.,

Defendant.

Case No. 3:25-CV-10933-JSC

**DEFENDANT BYTEDANCE, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Hearing Date: Sept. 24, 2026
Hearing Time: 10:00 a.m.
Judge: Jacqueline Scott Corley
FAC Filed: Apr. 13, 2026

## TABLE OF CONTENTS

Page

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. PLAINTIFFS LACK ARTICLE III STANDING ........ 2

II. PLAINTIFFS DO NOT HAVE STATUTORY STANDING FOR A DMCA CLAIM ........ 6

III. PLAINTIFFS FAIL TO ALLEGE CIRCUMVENTION OF ACCESS CONTROLS UNDER SECTION 1201(A) ........ 8

A. Plaintiffs Still Have Not Alleged TPMs That, in the Ordinary Course of Operation, Control Access to the Works ........ 8

B. Plaintiffs' "Initial Viewing" Theory Conflates Playback Delivery with Access Control ........ 10

C. Plaintiffs' Dictionary Definition Collapses Access to a Work With Subsequently Obtaining a Downloadable File ........ 11

D. The "Merged" TPM Theory Cannot Substitute for Statutory Showing of Access Controls ........ 11

E. *VidAngel* and Subsequent Cases Do Not Save the FAC ........ 12

IV. PLAINTIFFS SHOULD NOT BE GRANTED LEAVE TO AMEND ........ 15

CONCLUSION ........ 15

## TABLE OF AUTHORITIES

Page(s)

Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 15

*Ma v. Ashcroft*,
361 F.3d 553 (9th Cir. 2004) .......... 7

*CDK Global, LLC v. Tekion Corp.*,
No. 25-cv-01394-JSC, 2025 WL 1939951 (N.D. Cal. July 15, 2025) .......... 15

*Coal. of Clergy, Laws., & Professors v. Bush*,
310 F.3d 1153 (9th Cir. 2002) .......... 7

*Cordova v. Huneault*,
817 F.Supp.3d 819 (N.D. Cal. 2026) .......... 15

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 2

*Disney Enterprises v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) .......... 12, 13

*Echostar Satellite L.L.C. v. Viewtech, Inc.*,
543 F. Supp. 2d 1201 (S.D. Cal. 2008) .......... 7, 8

*Hattler v. Ashton*,
2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) .......... 8, 15

*Justice v. Suno, Inc.*,
No. 25-11739-FDS, 2026 WL 2445362 (D. Mass. Aug. 20, 2026) .......... 13

*Justice v. Uncharted Labs, Inc.*,
2026 WL 1430232 (S.D.N.Y. May 21, 2026) .......... 15

*Kadrey v. Meta Platforms, Inc.*,
2025 WL 744032 (N.D. Cal. Mar. 7, 2025) .......... 5

*Lasica v. America Online, Inc.*,
2015 WL 12791495 (C.D. Cal. Sept. 3, 2015) .......... 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
387 F.3d 522 (6th Cir. 2004) .......... 9

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
629 F.3d 928 (9th Cir. 2010) .......... *passim*

*MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*,
622 F.3d 361 (5th Cir. 2010)........................................................................ 1, 3, 5

*N.Y. Times Co. v. Microsoft Corp.*,
777 F.Supp.3d 283 (S.D.N.Y. 2025)........................................................................ 5

*Oracle Corp. v. SAP AG*,
765 F.3d 1081 (9th Cir. 2014)........................................................................ 4

*Post University Inc. v. Learneo, Inc.*,
2025 WL 2702043 (D. Conn. Sept. 23, 2025)........................................................................ 5

*Reddit, Inc. v. SerpApi LLC*,
2026 WL 2210094 (S.D.N.Y. July 31, 2026)........................................................................ 5, 15

*Schneider v. Cal. Dep't of Corr.*,
151 F.3d 1194 (9th Cir. 1998)........................................................................ 4

*Sony Music Entertainment v. Uncharted Labs Inc.*,
2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026)........................................................................ 15

*Tanzer v. Adobe Inc.*,
2026 WL 2446787 (N.D. Cal. Aug. 20, 2026)........................................................................ 3

*Ted Entertainment, Inc. v. Snap, Inc.*,
2026 WL 2435349 (C.D. Cal. Aug. 19, 2026)........................................................................ 12, 13, 14, 15

*The Intercept Media, Inc. v. OpenAI, Inc.*,
767 F.Supp.3d 18 (S.D.N.Y. 2025)........................................................................ 5

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
507 F. Supp. 2d 1096 (C.D. Cal. 2007)........................................................................ 9

*UMG Recordings, Inc. v. Suno Inc.*,
2026 WL 2410184 (D. Mass. Aug. 18, 2026)........................................................................ 11, 13, 14, 15

*VidAngel LLC v. ClearPlay, Inc.*,
703 F. Supp. 3d 1329 (D. Utah 2023)........................................................................ 7, 8, 12, 13

*Wash. Env't Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013)........................................................................ 4, 5

*Wheeler v. City of Santa Clara*,
894 F.3d 1046 (9th Cir. 2018)........................................................................ 15

<u>Constitutions</u>

United States Constitution
Article III........................................................................ 4

Statutes and Codes

United States Code
Title 17, Section 411(a) ..... 3
Title 17, Section 412 ..... 3
Title 17, Section 1201 ..... 3, 6, 14, 15
Title 17, Section 1201(a) ..... *passim*
Title 17, Section 1201(a)(1) ..... *passim*
Title 17, Section 1201(b) ..... 8, 11
Title 17, Section 1201(b)(1) ..... 11
Title 17, Section 1202(b) ..... 5
Title 17, Section 1203 ..... 6, 7
Title 17, Section 1203(a) ..... 1, 6, 8
Title 17, Section 1203(c)(2) ..... 3, 6
Title 17, Section 1203(c)(3) ..... 6

## INTRODUCTION

Plaintiffs' Opposition does not cure the central problems with their sole claim. Two threshold standing defects require dismissal even before this Court reaches the parties' dispute over the scope of Section 1201(a).

First, Plaintiffs lack Article III standing because they have not alleged that they themselves suffered any injury fairly traceable to Section 1201(a) circumvention, as opposed to copyright injuries related to alleged downloading, retention, and downstream use of their videos. Section 1201(a), the basis for Plaintiffs' sole claim, creates an "anticircumvention right distinct from copyright infringement," *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 948 (9th Cir. 2010), and "does not apply to the use of copyrighted works *after* the technological measure has been circumvented." *MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 366 (5th Cir. 2010) (emphasis in original). But the FAC and Opposition attribute every asserted injury—lost advertising and licensing revenue, diminished monetization, market harm, and loss of control—to BDI's alleged acquisition and use of their videos. The FAC does not allege *any* facts showing that circumvention, as opposed to the alleged copying and use, caused those injuries. Plaintiffs do not allege an injury traceable to the challenged conduct.

Second, Plaintiffs cannot establish statutory standing merely by invoking Section 1203(a)'s reference to "[a]ny person injured." 17 U.S.C. § 1203(a). Section 1203(a) requires more than injury alone; Plaintiffs must be "injured by a violation of section 1201." *Id.* Here, the alleged violation is circumvention of a TPM owned, deployed, and controlled by YouTube, not Plaintiffs. Plaintiffs do not allege that they own, operate, deploy, maintain, configure, or control any of the alleged TPMs. Instead, Plaintiffs acknowledge that they "delegated technical implementation of access controls to YouTube." FAC ¶ 158. Plaintiffs' interpretation of Section 1203(a) would transform every creator who posts content on a protected platform into a private enforcer of that platform's security systems, even where the creator has no role in or control over those protections. Neither Section 1203(a) nor Plaintiffs' authorities support that extraordinary result.

Third, on the merits, Plaintiffs still have not plausibly alleged circumvention of a measure that "effectively controls access" to their works, 17 U.S.C. § 1201(a)(1)(A), as opposed to measures

that either control access to a platform or protect against copying Plaintiffs' works. The statutory question is whether each measure, in the ordinary course of its operation, controls access to Plaintiffs' copyrighted works—not whether it can restrict copying, or in certain circumstances a requester's access to YouTube's platform. Plaintiffs chose to make their videos available for anyone to watch for free on YouTube. *See* FAC ¶ 33. They do not allege that BDI bypassed a password, paywall, or encryption that rendered their works inaccessible. And the measures they *do* allege—YouTube's rolling cipher, proof-of-origin tokens, session-bound URLs, IP blocking, and CAPTCHA challenges—only regulate file retrieval, request volume, automation, and downloading outside YouTube's platform. Expanding Section 1201(a) to encompass those extrinsic measures would effectively treat every technological restriction on obtaining a copy as an access control and erase the distinction Congress drew between the two. Applying Section 1201(a) to episodic controls or controls that regulate access after the fact would also ignore the statutory text. The statute provides that "a technological measure 'effectively controls access to a work' if the measure, *in the ordinary course of its operation*, requires the application of information, or a process or a treatment, with the authority of the copyright owner, *to gain access to the work*." 17 U.S.C. § 1201(a)(3)(B) (emphases added).

Finally, Plaintiffs have not alleged facts necessary to connect BDI itself to circumvention. The FAC does not identify which supposed TPM protected which Plaintiff's video at the relevant time, which tool BDI purportedly used to circumvent it, or how BDI allegedly circumvented any particular measure. *See* FAC ¶¶ 96, 99, 101-09 (alleging largely on "information and belief"). This failure of pleading separately warrants dismissal.

This Court should grant BDI's motion for any or all of these reasons. Moreover, because Plaintiffs have already amended their complaint once after BDI identified the same, central deficiencies in their claim, the Court should dismiss the FAC with prejudice.

## ARGUMENT

## I. PLAINTIFFS LACK ARTICLE III STANDING

Article III standing must be established by each plaintiff, for each claim, as to each form of relief. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Plaintiffs' allegations do not

satisfy that exacting standard.

Section 1203(c)(2) permits recovery only of "actual damages suffered by the party as a result of the violation." 17 U.S.C. § 1203(c)(2). Here, the alleged violation of Section 1201 is circumvention of technological measures that effectively control access to a protected work. But Section 1201(a) "creates a new anticircumvention right distinct from copyright infringement," *MDY Indus.*, 629 F.3d at 948, and "*does not apply to the use of copyrighted works after the technological measure has been circumvented*." *MGE UPS Sys.*, 622 F.3d at 366 (emphasis added). Plaintiffs therefore must plausibly connect each claimed loss to the alleged circumvention itself, not merely label the purported consequences of downstream copying and use as DMCA damages. This Court recently emphasized that allegations necessary to establish Article III standing must be supported by facts making the required inference "plausible rather than merely possible." *Tanzer v. Adobe Inc.*, 2026 WL 2446787, at *3 (N.D. Cal. Aug. 20, 2026). In *Tanzer*, the Court dismissed for lack of standing and failure to state a copyright infringement claim because the complaint failed to allege facts supporting the necessary inference that plaintiffs' copyrighted works were used to train the AI model at issue. *Id.* at *3-4. Here, Plaintiffs fail to connect their alleged injuries to circumvention because those injuries arise from what BDI allegedly did *after* any claimed circumvention—acquiring copies and using them to train AI models. *See, e.g.*, FAC ¶¶ 122-28.

Plaintiffs cannot avoid that distinction by invoking harms traditionally associated with copyright. Unregistered works may be protected by Section 1201, but Section 1201's independent cause of action does not authorize Plaintiffs to repackage alleged infringement losses as circumvention damages in order to sidestep the statutory prerequisites and defenses governing infringement claims. Congress separately required registration or preregistration before a civil infringement action concerning a United States work may be instituted, 17 U.S.C. § 411(a), limited statutory damages and fees for untimely registration, *id.* § 412, and left infringement claims subject to fair use and other defenses. Here, Plaintiffs pleaded no infringement claim, do not identify a single registered work, and emphasize that most YouTube videos are unregistered. FAC ¶ 13. Further, by asserting a non-copyright circumvention cause of action alone, Plaintiffs would seek to deny BDI the opportunity to raise a fair use defense—which is critical in AI copyright litigation.

Plaintiffs therefore cannot establish standing simply by pointing to injuries allegedly caused by copying, AI training, alleged lost licensing value, and loss of control. They must plausibly allege that those injuries resulted from the conduct actually prohibited by Section 1201(a).

Plaintiffs' assertion that their injuries would not have occurred but for circumvention does not establish otherwise. *See* ECF No. 42 ("Opp.") at 7. To satisfy Article III, the links in any alleged causal chain must "remain plausible" rather than "hypothetical or tenuous." *Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1141-42 (9th Cir. 2013) (citation omitted). Plaintiffs' allegations fail that test.

The FAC identifies six injury theories. FAC ¶ 121. The first four—lost advertising revenue, Premium revenue, progress toward Partner Program eligibility, and algorithmic amplification—are all view-based. *Id.* ¶¶ 122–25. But the FAC's own theory is that BDI retrieved files at machine scale for ingestion into AI models, not that BDI or any human watched them. *See id.* ¶¶ 1, 75–88, 104. Machine ingestion produces no viewer, advertising impression, Premium watch time, engagement signal, subscriber, or audience growth. Nor does the FAC allege that BDI's downloading prevented anyone from watching the same videos on YouTube. And it does not plausibly allege that, absent circumvention, BDI would instead have played more than 100 million clips through YouTube's monetized player. *Id.* ¶ 86. The only objective the FAC attributes to BDI was obtaining machine-readable training data. On those allegations, each retrieval cannot plausibly be treated as a lost human view or advertising impression.

The fifth and sixth theories—market harm and "loss of control"—fare no better. As to market harm, the FAC alleges only that BDI downloaded files rather than "purchase a copy." FAC ¶ 126. While the Opposition recasts that allegation as a lost negotiated license, Opp. at 7, the FAC itself invokes licensing only generally; it alleges no market for licensing these videos for AI training, no prior comparable licenses, and no offered price, negotiation, or lost transaction. FAC ¶¶ 19, 22, 24, 122. Even hypothetical-license damages must rest on objective, non-speculative evidence of market value, *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014), and the Opposition cannot fill in the gaps in the FAC's allegations, *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998). And Plaintiffs' sixth theory, "loss of control," does not plead

an independent economic loss. The FAC defines it as uncertainty about uncompensated exploitation and inability to ensure compensation, FAC ¶ 127—the same unpleaded licensing and downstream-use theory. It does not allege that BDI removed the works from YouTube, reduced their availability, interfered with an existing license, or prevented Plaintiffs from exploiting them.

*Reddit, Inc. v. SerpApi LLC*, 2026 WL 2210094 (S.D.N.Y. July 31, 2026), *see* Opp. at 7-8, is inapposite. That nonbinding decision found Article III standing based on the particular injuries and causal allegations before it. *Reddit*, 2026 WL 2210094, at *6-11. But *Reddit* did not address the Ninth Circuit's requirement that causal links not be "hypothetical or tenuous and remain plausible." *Bellon*, 732 F.3d at 1141-42 (citation omitted). Plaintiffs' allegations do not satisfy that requirement. Plaintiffs' claims simply assume that, absent the alleged circumvention, BDI probably would have generated monetized human views or purchased licenses rather than forgoing the content. That is overly speculative and insufficiently pleaded to establish standing.

*Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032 (N.D. Cal. Mar. 7, 2025), *see* Opp. at 8, is even further afield. *Kadrey* involved claims under Section 1202(b) (removal of copyright-management information ("CMI")), not Section 1201(a) (circumvention of access controls). Section 1202(b)(1)-(3) expressly requires a connection between the prohibited conduct related to CMI and infringement. 17 U.S.C. § 1202(b)(1)-(3) ("No person shall, without the authority of the copyright owner or the law—(1) intentionally remove or alter any copyright management information . . . knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title."). It makes sense that infringement may constitute an "injury that is traceable to the CMI removal." *Kadrey*, 2025 WL 744032, at *1. But that does not make Plaintiffs' asserted copyright injuries here traceable to either the distinct right protected by Section 1201(a) or the different conduct it prohibits—circumventing an access control.[1]

[1] Plaintiffs' reliance on *The Intercept Media, Inc. v. OpenAI, Inc.*, 767 F.Supp.3d 18 (S.D.N.Y. 2025), *N.Y. Times Co. v. Microsoft Corp.*, 777 F.Supp.3d 283 (S.D.N.Y. 2025), and *Post University Inc. v. Learneo, Inc.*, 2025 WL 2702043, at *5 (D. Conn. Sept. 23, 2025) is misplaced. Opp. at 8-9. Each involved Section 1202(b), which prohibits removal of CMI—conduct that itself facilitates the infringement alleged as the injury. Section 1201(a)(1), by contrast, prohibits circumvention and "does not apply to the use of copyrighted works *after* the technological measure has been circumvented." *MGE UPS Sys.*, 622 F.3d at 366 (emphasis in original). The question is not whether

If there were any question about what type of injury Plaintiffs actually allege, Plaintiffs' Prayer for Relief answers it. It asks the Court "to prevent or restrain infringement of [their] copyright-protected content," including through an injunction requiring BDI to "cease infringing" their "exclusive rights." FAC, Prayer for Relief ¶ D. The requested relief targets BDI's alleged downstream use and infringement, not any separate injury caused by purportedly defeating YouTube's technological measures. But Plaintiffs cannot use Section 1201 to obtain relief for alleged copyright infringement while avoiding the statutory prerequisites and defenses that would govern an infringement claim. And although Section 1203(c)(2) permits actual damages only when those damages are suffered "as a result of" the alleged violation, 17 U.S.C. § 1203(c)(2), the FAC does not plausibly allege that Plaintiffs' asserted injuries resulted from circumvention rather than BDI's alleged downstream acquisition and use of their works.

Finally, Plaintiffs' request for statutory damages under Section 1203(c)(3) does not cure that defect. *See* FAC, Prayer for Relief ¶ C. Statutory damages are a remedy available under Section 1203; they do not eliminate Section 1203(a)'s threshold requirement that the plaintiff actually be "injured by a violation of section 1201." 17 U.S.C. § 1203(a).

## II. PLAINTIFFS DO NOT HAVE STATUTORY STANDING FOR A DMCA CLAIM

Section 1203(a) authorizes suit by "[a]ny person injured by a violation of section 1201 or 1202." 17 U.S.C. § 1203(a). Plaintiffs' statutory standing argument turns on "any person," reasoning that because they are persons who suffered any injury, they may sue. Opp. at 10. But that reading reads out of the statute the words "injured by a violation" (here, of Section 1201(a)). It is not enough that Plaintiffs own copyrighted works and allege some economic injury; they must plausibly allege that they were injured by the alleged circumvention itself. Here, Plaintiffs allege the circumvention of TPMs owned, deployed, and controlled by YouTube. Plaintiffs do not allege any circumvention impaired any TPM they owned or controlled, required them to repair or restore any technological measure, or otherwise injured an interest they held in those measures. Instead, as shown above, the harms they assert arise from BDI's alleged downloading and downstream use of

---

Plaintiffs' asserted harms resemble copyright harms in the abstract; but whether they are fairly traceable to circumvention of access controls. They are not.

their works. But that is a copyright claim, and copyright ownership alone does not establish that Plaintiffs were "injured by" circumvention of YouTube's access controls.

Plaintiffs' reading of Section 1203 has no meaningful limiting principle and would produce absurd results. *See, e.g.*, *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir. 2004) ("[S]tatutory interpretations which would produce absurd results are to be avoided."). Under their theory, every content creator whose work appears on any platform with technological protections would become a private enforcer of the platform's security infrastructure. A blogger on Medium, an artist on Instagram, or a musician on Spotify would all have standing to sue anyone who scraped the platform, regardless of whether the creator had any role in deploying, controlling, or even understanding the platform's TPMs. Nothing in Section 1203's text or structure supports conscripting millions of platform users as private attorneys general to enforce platform-owned technological restrictions. *Coal. of Clergy, Laws., & Professors v. Bush*, 310 F.3d 1153, 1163 (9th Cir. 2002) ("[A] litigant may assert only his own legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties."). That is particularly true where, as here, Plaintiffs assert a DMCA claim to pursue classic copyright injuries for which, for a host of reasons (including fair use), they have no remedy under copyright law.

Plaintiffs' attempts to distinguish *VidAngel LLC v. ClearPlay, Inc.*, 703 F. Supp. 3d 1329 (D. Utah 2023), and *Echostar Satellite L.L.C. v. Viewtech, Inc.*, 543 F. Supp. 2d 1201 (S.D. Cal. 2008), which BDI cited in its Motion, are unavailing. Neither holds that copyright ownership alone is sufficient to enforce technological measures independently owned and controlled by a third-party plaintiff. Contrary to Plaintiffs' characterization of these cases, they are not just about whether copyright owners have standing. Opp. at 10-11. While Plaintiffs try to distinguish *ClearPlay* by emphasizing copyright ownership, that ignores the court's express reliance on the plaintiff's lack of a relationship to the TPM itself. 703 F. Supp. 3d at 1336. *Echostar*, by contrast, found standing because (unlike here) it was "reasonable to infer that [the plaintiff] also has the authority to control the measures protecting the programming." 543 F. Supp. 2d at 1206. And *MDY Industries* involved Blizzard, a company that both owned the copyrighted works (World of Warcraft) and designed, deployed, and controlled the TPM (Warden) that protected access to them. 629 F.3d at 935-36, 954.

Here, by contrast, Plaintiffs concede that YouTube—not Plaintiffs—implements and controls the TPMs. Indeed, the FAC alleges that Plaintiffs "delegated technical implementation of access controls to YouTube." FAC ¶ 158. *ClearPlay*, *Echostar*, and *MDY* do not hold that a copyright owner with no ownership, control, or operational role in a third party's TPMs is "injured by a violation" of those measures under Section 1203(a). Plaintiffs' contrary reading would convert every creator who posts content on a protected platform into a private enforcer of the platform's technological restrictions. Section 1203(a) does not compel that result.

## III. PLAINTIFFS FAIL TO ALLEGE CIRCUMVENTION OF ACCESS CONTROLS UNDER SECTION 1201(A)

Section 1201(a)(1) applies to technological measures that, "in the ordinary course of [their] operation" control access to a copyrighted work. 17 U.S.C. § 1201(a)(3)(B). Plaintiffs chose to make their videos freely available for anyone to watch on YouTube. FAC ¶ 33. The measures they identify do not prevent the public from watching those videos. Instead, they regulate the downloading of video files and automated activity on YouTube. *Id*. ¶¶ 33, 50-62.

The TPMs Plaintiffs identify govern things like locating the underlying media file, limiting automated requests, expiring file URLs (i.e., temporary download links that automatically deactivate after a specific condition like a time limit or download count), and verifying that file requests originate from YouTube's player. *See* FAC ¶¶ 50–62. Those mechanisms may make it more difficult to obtain a separate copy of a video or retrieve files outside YouTube's ordinary playback environment. But that does not establish that they control access to the audiovisual work itself. Section 1201(a) and (b) draw a line between the two, and consistent with that distinction, Section 1201(a)(1) "should be interpreted narrowly to exclude technologies that permit access to copyrighted work, but restrict copying." *Hattler v. Ashton*, 2017 WL 11634742, at *6, *8 (C.D. Cal. Apr. 20, 2017). Plaintiffs' theory erases that distinction.

### A. Plaintiffs Still Have Not Alleged TPMs That, in the Ordinary Course of Operation, Control Access to the Works

Under the DMCA, a measure "effectively controls access" only if, "in the ordinary course of its operation," it requires the user to apply information or a process "to gain access to the work."

17 U.S.C. § 1201(a)(3)(B). That inquiry is work- and measure-specific, but the FAC fails to satisfy this requirement for any of the alleged TPMs. The TPM's conditional architecture underscores the statutory defect: Plaintiffs have not plausibly alleged that each measure, "in the ordinary course of its operation," requires an authorized process "to gain access to the work," rather than regulating file retrieval or platform behavior in particular circumstances. *Id.*; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 546-47 (6th Cir. 2004) (measure did not effectively control access where users could access the work without encountering it). Instead, the FAC describes measures regulating file retrieval while acknowledging that users "can watch and listen to videos for free" through YouTube. FAC ¶ 33. As an analysis of the TPMs demonstrates, that is fatal to Plaintiffs' Section 1201(a) claim.

*Rolling cipher:* Rolling ciphers prevent users from obtaining a "usable file location" unless certain information is processed to generate a "valid media request URL," and function to inhibit access to the underlying media files for "downloading, copying or distribution." FAC ¶¶ 50-51. As the FAC itself makes clear, it restricts direct retrieval of the media file, not whether a viewer can access the work in the first instance.

*IP blocking and rate limiting:* This alleged TPM is triggered only by abnormal activity on the YouTube website, particularly a high volume of requests for a specific IP address. FAC ¶¶ 53-54. As alleged, it is a conditional, platform-level response to a particular requester's traffic pattern—not a measure that must be satisfied to access any particular copyrighted work.

*CAPTCHA challenges:* CAPTCHA challenges are only triggered "[w]hen traffic patterns indicate automated or suspicious activity." FAC ¶ 57. A CAPTCHA may qualify where it stands between all requesters and access to the copyrighted work. *See Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1112 (C.D. Cal. 2007). But the FAC alleges a conditional challenge triggered by a particular requester's traffic pattern. As a result, two automated requesters can seek the same video but only one encounters a CAPTCHA. The CAPTCHA therefore does not operate, in the ordinary course, as a condition on access to the copyrighted work; it is triggered, if at all, by how a particular requester uses YouTube.

*Session-bound URLs:* This alleged TPM involves the expiration of URLs after a limited

period of time. FAC ¶ 55-56. They are tied to a specific transaction or user session so it cannot be freely replayed elsewhere. But an ordinary viewer streaming a video on YouTube is unaffected by URL expiration because the player handles session continuity automatically and transparently.

*Proof-of-origin tokens:* Finally, YouTube allegedly requires these tokens be sent with requests to attest that they are coming from a genuine client. FAC ¶¶ 61-62. Like the other alleged TPMs, this concerns retrieval of the media files, not whether the public can access Plaintiffs' works through YouTube.

### B. Plaintiffs' "Initial Viewing" Theory Conflates Playback Delivery with Access Control

Plaintiffs now contend in their Opposition that these TPMs control "initial access" because YouTube's player performs certain processes before or during playback. Opp. at 14. But that characterization conflicts with the FAC's specific allegations about what the TPMs actually do. The FAC alleges that users "can watch and listen to videos for free" while YouTube "locks users from downloading copies," and that YouTube uses technological tools to detect and block "access to files for *unauthorized downloading*." FAC ¶¶ 33–34 (emphasis added). The rolling-cipher allegations explain that it inhibits "*downloading, copying or distribution*" and "permanent, unrestricted *download*." *Id.* ¶ 51 (emphases added). Helping deliver a video, though, does not make a process an access control.

Plaintiffs' generalized allegation that playback involves a "sequence of authorized processes" does not establish that any alleged TPM controls access to the works. *Id.* ¶ 44. The FAC alleges what the individual TPMs do: the rolling cipher, temporary URLs, and origin tokens, according to Plaintiffs, regulate retrieval of the media files, while rate limits, IP blocking, and CAPTCHAs respond to high-volume or suspicious activity. *Id.* ¶¶ 44, 50–62. In other words, the first group governs how files are retrieved, while the second is triggered only by particular patterns of activity. Indeed, the FAC alleges that IP blocking and rate limits are triggered only *after* abnormal request volume; CAPTCHAs are triggered only by "automated or suspicious activity"; session-bound URLs expire *after* access is granted; and tokens and the rolling cipher govern requests for underlying media data. *Id.* ¶¶ 50–62. Those allegations do not establish that any

measure, in the ordinary course of its operations, controls access to Plaintiffs' works or that an ordinary viewer must overcome one to watch a video. Plaintiffs cannot transform the functions they plead into access controls through generalized labels. *MDY* requires a work- and measure-specific inquiry, not a conclusion that every component of a platform's playback architecture controls access to every work. 629 F.3d at 952–54. That distinction matters for conditional anti-bot controls: a CAPTCHA may qualify where it stands between a requester and the work; it does not become an access control to every copyrighted work on a platform merely because a certain requester triggers it. FAC ¶ 57 (alleging CAPTCHA is triggered only "[w]hen traffic patterns indicate automated or suspicious activity" and prevents the requesting client from proceeding).

**C. Plaintiffs' Dictionary Definition Collapses Access to a Work With Subsequently Obtaining a Downloadable File**

To get around these facts, Plaintiffs argue that "access" includes the ability to "obtain" something and thus necessarily the ability to obtain a downloadable file. Opp. at 18. But Section 1201(a) asks whether a measure controls access "to the work." It does not say access to a particular file location, server path, or mode of delivery.

The distinction is structural, not semantic. Section 1201(a) prohibits circumvention of an access control. Section 1201(b), by contrast, addresses technologies that protect the copyright owner's exclusive rights—including reproduction—but does not prohibit circumventing a copy control. 17 U.S.C. §§ 1201(a)(1), (b)(1); *see UMG Recordings, Inc. v. Suno Inc.*, 2026 WL 2410184, at *2-3 (D. Mass. Aug. 18, 2026). If an anti-ripping or anti-download measure becomes an access control whenever it limits a user's ability to obtain the underlying file, there is no meaningful class of streaming copy controls left for Section 1201(b) to govern. That is precisely the redundancy *MDY* instructs courts to avoid. 629 F.3d at 946 ("Nonetheless, we read the differences in structure between § 1201(a) and (b) as reflecting Congress's intent to address distinct concerns by creating different rights with different elements.").

**D. The "Merged" TPM Theory Cannot Substitute for Statutory Showing of Access Controls**

Plaintiffs alternatively argue the five TPMs "may" operate as merged access and copy

controls. Opp. at 19-23. A single measure may, of course, serve both access- and copy-control functions. *VidAngel*, 869 F.3d at 864. But the *possibility* of dual function is not *proof* of dual function. To qualify under Section 1201(a), the measure must independently satisfy Section 1201(a)(3)(B) by effectively controlling access to the copyrighted work. But "merged" is a description, not a substitute for the statutory showing.

The FAC's own allegations do not establish that here. They describe the rolling cipher as obscuring the media-file URL; IP blocking and rate limiting as responding to abnormal traffic; session-bound URLs as expiring after a limited period; CAPTCHAs as challenging suspected automated activity; and proof-of-origin tokens as validating requests from YouTube's player. FAC ¶¶ 50–62. Those measures may impede downloading, automated extraction, or direct retrieval of media files. But that does not establish that they also control whether a user can access the audiovisual work itself, and the observation in *Ted Entertainment, Inc. v. Snap, Inc.*, 2026 WL 2435349, at *6 (C.D. Cal. Aug. 19, 2026) that the rolling cipher may also restrict downloading therefore does not answer the antecedent question whether it controls access to the work.

The Copyright Office's recognition of "merged access and copy controls" does not change the analysis. Opp. at 20. It recognizes that a single technology *may* perform both functions; it does not collapse them, let alone conclude that they necessarily do. Encryption that must be decrypted to view a work, for example, may restrict both access and copying. But a measure limiting or restricting copying, downloading, or automated use of the platform does not become an access control merely because it operates as part of the platform's delivery architecture.

**E. *VidAngel* and Subsequent Cases Do Not Save the FAC**

Plaintiffs rely on *Disney Enterprises v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), for the proposition that a work may be protected by an access control even when an authorized means of access exists. Opp. at 13-14. If Plaintiffs' reading of *VidAngel* were correct, a lock on a movie theater's projection booth would "control access" to the movie simply because patrons can only watch the film in the theater screen, rather than enter the booth and take the film reel home. But the lock controls access to the copy and means of delivery, not the movie itself.

The technological difference is straightforward. In *VidAngel*, the encryption operated on the

copyrighted content: without decryption, there was no intelligible movie to watch. 869 F.3d at 853. Here, the alleged rolling cipher operates on the address used to retrieve the underlying file: without bypassing it, the user still has an intelligible movie to watch through YouTube, but may not obtain the file in the manner Plaintiffs say BDI did.

*Suno*'s DVD-player hypothetical misses that distinction. *Suno* reasoned that disc encryption would remain an access control even if studios gave every purchaser a licensed player for free. 2026 WL 2410184, at *6. True—but only because the disc remained unintelligible unless the player decrypted the copyrighted content. Here, the pleaded measure protects the route for directly retrieving a file while YouTube makes the complete expression perceptible through the public player. The relevant distinction is not free versus paid access, or authorized versus unauthorized access. It is access to the work versus subsequent acquisition and copying of a file.

Plaintiffs contend that post-*VidAngel* decisions addressing Section 1201(a) claims involving YouTube's TPMs dispose of all of BDI's arguments here. Opp. at 23-24. But while *Snap* and *Suno* have addressed similar access-control theories, neither resolved all of the defects here. Both are wrongly decided, in part because both disregard the technological mechanisms (and functionality) of the alleged TPMs. And none of the other cases on which Plaintiffs rely save their claims either.

*Suno* does not cure Plaintiffs' pleading defects. It addressed only the rolling cipher and acknowledged the proposed complaint "does not explain how [the playback] process works." 2026 WL 2410184, at *6. The court supplied the missing link, inferring that the YouTube player "must decrypt or descramble the file URL," and left the issue for discovery.[2] *Id*. But Plaintiffs, not the Court, must plead facts showing that each TPM controls access. A complaint is not plausible simply because the mechanics are unknown and discovery might later establish the missing element.

Worse yet, Plaintiffs not only fail to adequately plead how the alleged circumvention was done, but whether it was done at all. In *Suno*, discovery established that Suno had downloaded audio files from YouTube using yt-dl and yt-dlp. *Id*. at *1. Even on that record, the court declined to determine whether those tools circumvented the rolling cipher, recognizing they might use

[2] *Justice v. Suno, Inc.*, No. 2026 WL 2445362, at *4 (D. Mass. Aug. 20, 2026), likewise denied dismissal but simply followed *Suno* "[f]or the reasons stated" there and left the rolling-cipher issues for factual development.

authorized means, bypass the measure altogether, or "fall in a gray area in between." *Id.* at *6. Here, Plaintiffs do not even allege which tool BDI used, offering yt-dlp only as an "example" of what BDI might have used. FAC ¶¶ 102-03.

*Suno* identifies the questions Plaintiffs fail to answer here. A measure does not effectively control access where another route to the work remains readily open, and a defendant does not "circumvent" merely by using a technological process without permission; it must avoid, bypass, remove, deactivate, or impair the measure itself. *Id*. at *4-5. And that measure must apply "in the ordinary course of its operation" for someone to gain access to the work. Plaintiffs therefore must allege what access each TPM gates and what BDI allegedly did to bypass it. General allegations that BDI must have used downloading tools are not enough.

*Snap* is equally inapplicable. *Snap* treated a restriction to YouTube's "authorized streaming architecture" as equivalent to restricting access to the copyrighted work. 2026 WL 2435349, at *4-5. That collapses Section 1201's distinction between controlling access to a work on the one hand and controlling the manner in which an already-accessible work is delivered, retrieved, or copied on the other. The statutory question is not whether YouTube prefers users to receive content through its player; but whether the particular TPM requires an authorized process "to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). *Snap* cites *MDY* for the proposition that an access control may operate after access is initially granted. 2026 WL 2435349, at *6-7. But *MDY* did not hold that every secondary restriction is an access control. The court still asked whether Warden actually controlled access to the particular copyrighted work—and held that it did not as to works that remained accessible without Warden. 629 F.3d at 952–54.

Nor can *Snap*'s generalized treatment of YouTube's architecture substitute for a TPM-by-TPM analysis. Section 1201 asks whether, in the ordinary course of operation, "the measure" controls access to "the work." Plaintiffs must plausibly allege that each TPM does so. But the FAC alleges materially different functions: the rolling cipher obscures a media-file URL; session-bound URLs expire; tokens authenticate requests; and rate limits, IP blocking, and CAPTCHAs respond to certain traffic patterns. FAC ¶¶ 50–62. Those measures do not perform the same function just because they operate in the same platform. A generalized reference to a "sequence of authorized

processes," *see id.* ¶ 44, cannot transform five distinct mechanisms directed at file retrieval and automated conduct into access controls. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The remaining decisions do not compel a different result. *Hattler* and *Lasica v. America Online, Inc.*, 2015 WL 12791495 (C.D. Cal. Sept. 3, 2015), recognize that Section 1201 does not convert restrictions on use or copying of publicly accessible works into access controls. *Sony Music Entertainment v. Uncharted Labs Inc.*, 2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026), *Justice v. Uncharted Labs, Inc.*, 2026 WL 1430232 (S.D.N.Y. May 21, 2026), and *Cordova v. Huneault*, 817 F.Supp.3d 819 (N.D. Cal. 2026), like *Snap* and *Suno*, incorrectly decided the access/copy classification despite allegations focused on unauthorized downloading. And *Reddit* is distinguishable because the CAPTCHA there allegedly erected an actual gate that prevented automated users from accessing the protected search results; the content was not otherwise "freely readable" because the TPM, which was triggered by unrecognized users, blocked access to the results pages unless the user satisfied the CAPTCHA. 2026 WL 2210094, at *16-17. Here, by contrast, Plaintiffs' videos remain freely viewable without encountering or overcoming the alleged TPMs, and Plaintiffs allege that CAPTCHAs are not a systematic measure, but rather are triggered only by particular behavior.[3] *See* FAC ¶ 57. *Reddit* thus confirms that a measure that gates access to a work is different than one that regulates how an already-accessible work may be retrieved or copied.

## IV. PLAINTIFFS SHOULD NOT BE GRANTED LEAVE TO AMEND

Plaintiffs already amended their complaint after BDI identified these defects. They offer no basis to believe another amendment would cure them. Opp. at 25; *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018). Accordingly, Plaintiffs should not be granted leave to amend.

## CONCLUSION

For the foregoing reasons, this Court should grant dismissal with prejudice.

[3] Plaintiffs also misconstrue BDI's citation to *CDK Global, LLC v. Tekion Corp.*, 2025 WL 1939951 (N.D. Cal. July 15, 2025). Opp. at 17 n.4. CDK's software system was not publicly accessible, but was protected by private networks, firewalls, and access restrictions that defendant allegedly bypassed. *Id.* at *9. By contrast, Plaintiffs' works are freely viewable.

Dated: August 27, 2026

Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

*/s/ Anne M. Voigts*

ANNE M. VOIGTS (220783)
LAURA C. HURTADO (267044)
KAYVAN M. GHAFFARI (299152)

*Attorneys for Defendant,*
*BYTEDANCE INC.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 27, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Anne M. Voigts*
ANNE M. VOIGTS (220783)

*Attorneys for Defendant,*
*BYTEDANCE INC.*